# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Case Number: 1:08-CV-00847

| | | |
|---|---|---|
| ANDREA C. WEATHERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF NORTH | ) | |
| CAROLINA AT CHAPEL HILL; | ) | **VERIFIED** |
| HERBERT B. PETERSON, | ) | **SECOND AMENDED CIVIL** |
| in his individual and official capacity; | ) | **COMPLAINT** |
| JONATHAN KOTCH, | ) | |
| in his individual and official capacity; | ) | **JURY TRIAL DEMANDED** |
| BARBARA K. RIMER, | ) | |
| in her individual and official capacity; | ) | |
| EDWARD M. FOSTER, | ) | |
| in his individual and official capacity; | ) | |
| and | ) | |
| SANDRA L. MARTIN, | ) | |
| in her individual and official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES the Plaintiff, Andrea C. Weathers, by and through her counsel of record, Hedrick Murray Bryson Kennett Mauch & Connor PLLC, and hereby amends her complaint filed on November 23, 2008 and her previously amended complaint, filed on December 1, 2008, pursuant to Federal Rules of Civil Procedure 15(a)(2) and with the written consent from Defendants, alleges and says as follows:

1

## NATURE OF THE ACTION

1.     This is an action brought under the Civil Rights Act of 1866, as amended by Section 101 of the Civil Rights Act of 1991, codified in 42 U.S.C. §1981 ("Section 1981"); 42 U.S.C. §1983 of The Civil Rights Act of 1871 (Section 1983); violation of civil rights under Title VII of the Civil Rights Act of 1964 as amended, codified in 42 U.S.C. §2000e et. seq; and violation of due process under the U.S. and North Carolina Constitutions for injunctive relief, compensatory damages and punitive damages arising from the terms and conditions of employment imposed by Defendants on Plaintiff, an African-American female.

2.     Defendants engaged in an ongoing pattern or practice of race discrimination against Plaintiff over the course of the seven years that she was employed by Defendant University of North Carolina at Chapel Hill ("Defendant UNC" or "the University"). This practice of racial discrimination resulted in the complete exclusion of Plaintiff within her department, the Department of Maternal and Child Health ("the MCH Department" or "the Department"), to the point where she was unable to attain any type of tangible collaboration to achieve the peer-reviewed publications necessary for continued employment and promotion within the Department, despite her repeated and diligent efforts to achieve such collaborations.  Plaintiff was treated less favorably than similarly-situated junior faculty members of other races, was subjected to numerous incidents of racially-based comments, and experienced a hostile work environment based

2

upon her race. Plaintiff cites numerous examples of her experiences of racial discrimination during her employment by Defendant UNC in her affidavit of record ("Affidavit of Andrea C. Weathers"), filed on November 23, 2008.

3. When Plaintiff raised her concerns of racial issues, informally and formally, to the Defendants and Defendants' agents, she was repeatedly and systematically ignored and dismissed, thereby perpetuating the problem. Plaintiff raised her concerns of race playing a factor in her being isolated or excluded in her Department to at least the following University administrators or officials: Defendant Peterson, Defendant Rimer, Dr. Bernadette Gray-Little (Executive Vice Chancellor and Provost), Dr. Steve Allred (Assistant to the Provost for Academic Affairs), Dr. William Rivenbark (Chair of the Grievance Committee in 2006, which is referenced in paragraphs 39-44 hereinbelow), Dr. Kerry Kilpatrick (Associate Dean for Academic Affairs), Dr. Archie Ervin (Chancellor for Diversity), Dr. Steve Zeisel (Associate to the Dean for Research), Peggy Leatt (Associate to Dean for Academic Affairs), the University Ombudsman, and University EEO Officer Ann Penn.

4. Race was at least a motivating factor in Defendants' decision not to reappoint or promote Plaintiff and to terminate Plaintiff's employment, which termination ultimately took effect on or about December 4, 2008.

5. In her capacity as an assistant professor at the University, Plaintiff received a federal grant in 2007 through the National Institutes of Health ("NIH") entitled

3

"Migration and Access to Care: An Innovative Population-Based Sampling Strategy." Concurrent with Plaintiff's termination, Defendant UNC informed Plaintiff that it would also terminate the NIH grant if she could not successfully transfer it to another institution within thirty days of her last day of employment.

6.     Plaintiff seeks compensatory and punitive damages resulting from the aforementioned practice of racial discrimination and all related costs and attorneys fees.

7.     Plaintiff previously filed motions in this action for a temporary restraining order and a preliminary injunction seeking the Court to order that Defendant UNC be:

(a)     ENJOINED from terminating Plaintiff's employment with the University originally effective on November 30, 2008 and ORDERED to continue Plaintiff's employment in the same position as an assistant professor on the tenure track within the Department of Maternal and Child Health until this matter is completely resolved or for one (1) year from entry of such an injunction, whichever comes first;

(b)     ENJOINED from hiring a replacement to fill Plaintiff's position until this matter is resolved or for one (1) year from the entry of such an injunction, whichever comes first;

(c)     ENJOINED from terminating Plaintiff's federal grant with NIH entitled "Migration and Access to Care: An Innovative Population-Based Sampling Strategy";

(d)     ENJOINED from disseminating information injurious to the professional or personal reputation of Plaintiff;

4

(e)    ORDRED to pay Plaintiff in accordance with her current salaried position and continue providing the same associated benefits, insurance coverage, and rights incident to the conditions of her employment and position until this matter is resolved or for one (1) year from the entry of such an injunction, whichever comes first; and

(f)    ORDERED to pay Plaintiff's attorney's fees incident to pursuing these motions should Plaintiff be the prevailing party for same.

Plaintiff maintains her right to appeal the denial of her motions for temporary restraining order and preliminary injunction and now also seeks 1) reinstatement to her previous position with the University and 2) a permanent injunction for similar equitable relief where still applicable as well as to enjoin Defendants from engaging in any further adverse, discriminatory, or retaliatory action against Plaintiff.

## PARTIES

8.    Paragraphs 1-8 above are realleged as if fully set forth herein in writing, together with the Affidavit of Andrea C. Weathers, filed on November 23, 2008.

9.    Plaintiff, Dr. Andrea C. Weathers, is a resident of Wake County, North Carolina.    She was, until December 4, 2008 an assistant professor in the MCH Department in the School of Public Health ("SPH") at the University of North Carolina at Chapel Hill.    Plaintiff is an African-American female and, to her knowledge, was throughout the time in question the only African-American junior faculty member on the tenure track in the MCH Department.

5

10.     Defendant University of North Carolina at Chapel Hill ("Defendant UNC" or "the University") is an agency or a body established by the General Assembly of the State of North Carolina and has the capacity to sue and to be sued.

11.     Upon information and belief, Defendant Herbert B. Peterson is a resident of Orange County, North Carolina. Defendant Peterson is a Caucasian male, is the current Chair of the MCH Department at the University, and was Plaintiff's immediate supervisor. Defendant Peterson is named in this action in his individual capacity and in his official capacity as a University official.

12.     Upon information and belief, Defendant Jonathan Kotch is a resident of Durham County, North Carolina. Defendant Kotch was the former Interim Chair of the MCH Department and Plaintiff's former immediate supervisor. Defendant Kotch is a Caucasian male and is currently a tenured full professor in the MCH Department at the University. Defendant Kotch is named in this action in his individual capacity and in his official capacity as a University official.

13.     Upon information and belief, Defendant Barbara K. Rimer is a resident of Orange County, North Carolina. Defendant Rimer is a Caucasian female and is the Dean of the School of Public Health at the University. Defendant Rimer is named in this action in her individual capacity and in her official capacity as a University official.

14.     Upon information and belief, Defendant Edward M. Foster is a resident of Orange County, North Carolina. Defendant Foster is a Caucasian male and is a tenured

6

full professor in the MCH Department. Defendant Foster is named in this action in his individual capacity and in his official capacity as a University official.

15. Upon information and belief, Defendant Sandra L. Martin is a resident of Orange County, North Carolina. Defendant Martin is a Caucasian female and is a tenured full professor in the MCH Department. Defendant Martin is named in this action in her individual capacity and in her official capacity as a University official.

## JURISDICTION AND VENUE

16. Paragraphs 1-15 above are realleged as if fully set forth herein in writing, together with the Affidavit of Andrea C. Weathers, filed on November 23, 2008.

17. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343, 1345, and 1391; 42 U.S.C. §2000e-5(f); 42 U.S.C. §1981; and 42 U.S.C. §1983.

18. This Court has personal jurisdiction over each Defendant, who each reside within the Middle District of North Carolina.

19. Venue is proper in the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. §1391(b) and (c) in that the Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## FACTS COMMON TO ALL COUNTS

20. Paragraphs 1-19 above are realleged as if fully set forth herein in writing,

7

together with the Affidavit of Andrea C. Weathers, filed on November 23, 2008.

21.      Plaintiff received her Bachelor of Science in Biology from the University of North Carolina at Chapel Hill in 1983, her Medical Doctor from East Carolina University in 1987, her Master of Public Health from Johns Hopkins University in 1995, and her Doctor of Public Health from Johns Hopkins University in 2001.

22.      Plaintiff practiced medicine for about ten (10) years prior to earning her Doctor of Public Health. In or about 1996 Plaintiff returned to North Carolina to complete her doctoral research. In 2001 the MCH Department Chair at that time, Dr. Pierre Buekens, contacted Plaintiff and told her of an open position for assistant professor on the tenure track.

23.      Plaintiff interviewed with the University and gave a talk on her research interests in the Department. Only about 5 or 6 people attended in a room that normally seats almost 80 people.

24.      When Plaintiff interviewed with faculty member Dr. Ana Maria Siega-Riz, Dr. Riz asked Plaintiff whether she thought she should have done a "post-doc" before considering the assistant professor position. A "post-doc," or post-doctoral fellowship, is a position held subsequent to completion of doctoral studies which is typically dedicated solely to research. When Plaintiff inquired further, Dr. Riz said that because Plaintiff was a medical doctor, the fact that she had not completed a "post-doc" would not be a problem. When Plaintiff questioned Dr. Buekens about the issue, he indicated that there

8

was no problem with Plaintiff coming in on an unconventional track (i.e., clinical and residency, as opposed to research) because Plaintiff had a great record, had an area of interest relevant to the Department, and had excellent recommendations from Johns Hopkins University.

25.     Plaintiff was hired by the University and began her employment in the MCH Department on or about December 1, 2001 as an assistant professor on the tenure track. Plaintiff's initial appointment term was for a standard four years, from 2001 to 2005, with application for reappointment scheduled for early 2004.

26.     At the time Plaintiff was hired, the Chair of the Department and Plaintiff's supervisor was Dr. Buekens, referenced hereinabove. Defendant Kotch was a full professor in the Department and had been employed by the University since approximately 1978. One of the first things Defendant Kotch said to Plaintiff, during his individual interview with Plaintiff in 2001, was "I guess I'll be the one who ends up having to work with you."

27.     During Plaintiff's first two weeks of employment, she noticed that everyone in the Department seemed to be keeping to themselves and that she had not met many members of the faculty. Thus, Plaintiff decided to approach everyone's office within the Department and introduce herself in order to initiate relationships for potential collaborations on publications and other networking. A staff member, Sharon Grubb, Assistant to the Department Chair, saw Plaintiff going from door to door by herself and

told Plaintiff that this was not something a new junior faculty member should have to do alone; Ms. Grubb then accompanied Plaintiff as she walked around the Department floor knocking on doors. To those faculty members who were absent or unavailable that day, Plaintiff sent emails introducing herself.

28.     During Plaintiff's first six months in the Department, Dr. Buekens conducted Plaintiff's first annual review. Dr. Buekens stated, among other things, the following:

(a)     "I was totally impressed by your achievements";

(b)     "Your publication record is excellent with one paper accepted in Pediatrics and another one ready to be submitted soon";

(c)     "Your grant support is excellent with one proposal submitted to the Casey Foundation. This is an excellent achievement after only one semester in a faculty position!";

(d)     "I encourage you to continue your excellent work. It would be great if you could submit 2 (two) to 4 (four) manuscripts during the next year, and at least one proposal to a Federal Agency"; and

(e)     "I thank you for the role you are playing in the Department."

29.     In approximately the fall of 2002, Dr. Buekens was replaced by Defendant Kotch, who became the Interim Department Chair and Plaintiff's new immediate supervisor. Dr. Kotch was also the Graduate Student Advisor at this time.

10

30.     From the time that Plaintiff arrived in the Department in 2001, Defendant Kotch consistently created an environment of social and professional exclusion for Plaintiff based on her race and took affirmative steps to make Plaintiff's teaching experience and overall employment within the Department and the University difficult, unfair and uncomfortable.     Defendant Kotch consistently exhibited racially discriminatory attitudes towards Plaintiff and African Americans in general, and Plaintiff noticed that he did not exhibit the same maltreatment to non-African American faculty members.

31.     Due to Defendant Kotch's esteemed and influential position within the MCH Department and the University, his actions and attitudes permeated throughout the MCH Department and beyond, creating an atmosphere in which other faculty members, including senior faculty members, did not want to associate or collaborate with Plaintiff and otherwise developed a negative association with Plaintiff.  Without such associations and collaborations, it became extremely difficult for Plaintiff to build necessary contacts to become a co-author on publications.

32.     For several years, Plaintiff continued to try to make connections and relationships with others within the Department, as well as with anyone who shared even somewhat similar research interests.  Those who did give Plaintiff a few minutes of their time were dismissive, had somewhere else to be, or professed to have research interests that did not overlap with Plaintiff's.  In addition to verbal contacts, initial emails, and

11

follow-up emails, Plaintiff sent handwritten thank-you notes to those faculty members who spoke with her in an effort to make a good impression and with the hope that other faculty members would eventually connect with her. Not one faculty member ever reciprocated the interest or invited Plaintiff to collaborate with him or her on publications.

33.     In approximately late 2003 and 2004, in response to Plaintiff's inquiries about clarification on a departmental policy relevant to student advisement procedures, Defendant Kotch sent Plaintiff a series of emails exhibiting his dismissive and negative responses (which are described in more detail in Plaintiff's Affidavit of Andrea C. Weathers, filed of even date herewith). Defendant Kotch instructed Plaintiff to stop emailing other faculty in the Department with questions about departmental guidelines and he informed Plaintiff via email that he had asked other faculty members to refer all further inquires from Plaintiff directly to him. A 2006 Faculty Grievance Committee determined that these actions on the part of Dr. Kotch had "alienated" Plaintiff within the Department, as described in paragraph 42(b) below.

34.     In November of 2004, Plaintiff was up for her first reappointment to a three (3) year term, which would extend from December 1, 2005 to November 30, 2008. Plaintiff was successfully reappointed to a three-year term as assistant professor.

35.     After Plaintiff's reappointment in November 2004, Defendant Peterson told Plaintiff that her reappointment had "sailed through." Plaintiff also received a letter

12

dated November 18, 2004 from the University Chancellor, which letter confirmed her 2004 reappointment and expressed the Chancellor's "congratulations in the *confidence* placed in [Plaintiff] by her colleagues."

36.     Unbeknownst to Plaintiff, Executive Associate Provost Steve Allred wrote a letter dated October 18, 2004 to the Interim SPH Dean, Margaret Dardess, regarding Plaintiff's 2004 reappointment. In this letter, Dr. Allred stated, among other things, that he and the University's Health Sciences Advisory Committee had "serious reservations about [Plaintiff's] prospects for attaining promotion and tenure when she is reviewed again in three years [in 2007]."

37.     At the time of her 2004 reappointment, Plaintiff was not told about Dr. Allred's letter, which became part of Plaintiff's University personnel file and which subsequent adverse employment decisions would in part be based upon.

38.     Plaintiff further alleges that she was not advised by Defendants that the MCH Department and higher reviewing bodies were apparently so concerned about her performance that they were already expressing doubts about her ability to be reappointed and to obtain tenure in three years.

39.     On or about August 25, 2006, Plaintiff filed a grievance complaint under the University's internal policies based on the "inappropriate behavior" of senior faculty within the Department, including Defendants Kotch and Peterson, namely concerning incidents related to their interference in Plaintiff's student advising responsibilities and

13

the placement of comments in Plaintiff's 2005 annual faculty review suggesting Plaintiff's inadequacy in student advising.

40.     In her initial discussions with the grievance chair, Dr. William Rivenbark, Plaintiff informed Dr. Rivernbark about her concerns that race had been a factor in her negative experiences within the Department, including the specific incidents she had filed the grievance about. Plaintiff also told Dr. Rivenbark that she hesitated to bring race to the fore because she had been raising such concerns for over four years to faculty, Defendant Peterson, the school, the provost's office, etc. to no avail; people would simply deny it, ignore it, or "not see it."

41.     Dr. Rivenbark agreed that Plaintiff should proceed with the grievance and focus on the *conduct* of the actors in question, as opposed to their *motives*. Plaintiff told Dr. Rivenbark that if, during the hearings, the grievance committee questioned Plaintiff about the issue of race, she would let the committee know of her concerns. Dr. Rivenbark indicated that, pursuant to the grievance policies, because Plaintiff had raised concerns about race, the hearings would need to be tape recorded.

42.     Pursuant to the policies, Dr. Rivenbark appointed a subcommittee to hear the grievance, which consisted of just two Caucasian faculty members from other departments. After a two-day hearing, the subcommittee did not find that the actions of Defendants Kotch and Peterson were "grievable." However, in its "Report and Recommendations," the subcommittee found, among other things:

14

(a)     That it was not helpful for Defendant Kotch to call Plaintiff "picky" or to say this was an "Andrea problem," rather than a Department problem (for more detail about this incident and other examples of Dr. Kotch's negative statements see paragraph 6(d) of Plaintiff's affidavit);

(b)     That when Defendant Kotch asked Plaintiff to stop emailing other faculty in the Department to ask about departmental guidelines, this clearly alienated Plaintiff and appears to have been at least partially responsible for aggravating the situation;

(c)     That with respect to the Department's policies regarding faculty advisors and their relationships with students, the Department needed to discuss its policies with new and continuing faculty on a regular basis. Faculty come to the Department from diverse backgrounds and it should be clear to them how to interpret the handbook; and

(d)     That when issues arose regarding Plaintiff's advising, neither Defendant Kotch nor Defendant Peterson handled the matter skillfully. It is the responsibility of the Department Chair [Defendant Peterson] and the Graduate Student Advisor [Defendant Kotch] to communicate clearly and effectively with faculty and this did not occur in Plaintiff's case.

43.     The subcommittee recommended that Defendant Peterson and Plaintiff meet to discuss the findings of its report. Defendant Peterson and Plaintiff had two post-grievance meetings, which were audio-taped at Plaintiff's request and Defendant Peterson's consent. Dr. Rivenbark attended as a mediator/observer.

44.    In the first post-grievance meeting, held on January 30, 2007, Plaintiff again raised her concerns about the role that race played in all that had happened to her within the Department, which concerns therefore made her skeptical and worried about how to move forward. As Defendant Peterson had previously done when Plaintiff had raised such concerns, he denied that race was a factor in Plaintiff's treatment.

45.    Later that year, on or about May 31, 2006, Plaintiff received an email from the Department regarding her upcoming 2007 reappointment, which would be a promotion to associate professor with tenure. The email provided the necessary information and deadlines for submission of the promotion package, including the deadline of *May 1, 2007* to submit the package to the Department. The Department had a subsequent deadline of May 25, 2007 to submit the package to Defendant Dean Rimer's office. The email also provided a website link to the SPH's Appointments, Promotions, and Tenure Manual (hereinafter "APT Manual") for the complete instructions regarding the promotion package application.

46.    Based on the emailed information and accompanying APT Manual instructions, Plaintiff planned her following year accordingly regarding preparation of her promotion package and her other numerous personal and work obligations, which included the preparation of an application for an NIH grant that was due on or about March 16, 2007.

16

47.     Neither the initial May 31, 2006 email nor the APT Manual indicated that it was critical or imperative that any items on the package promotion checklist be submitted prior to May 1, 2007.

48.     Neither the initial May 31, 2006 email nor the APT Manual indicated that failure to provide any items requested earlier than May 1, 2007 would prohibit either submission of the package by May 1, 2007 or being considered for reappointment and promotion altogether.

49.     Prior to the Department deadline of May 1, 2007, Defendant Peterson sent a letter to Plaintiff dated April 4, 2007, indicating that as a result of Plaintiff not having provided him the names of four references by an earlier date that was not listed in the APT Manual or previous promotion package instructions, Plaintiff had "made the decision to forgo being considered for promotion and tenure." Defendant Peterson thereby unilaterally and categorically blocked Plaintiff from submitting her promotion package prior to the established MCH Department deadline of May 1, 2007.

50.     Plaintiff alleges that such conduct by Defendants was highly suspect, as she had never before observed or known of a situation, at the Defendant University or any other institution of higher learning that she had been involved with, where missing an apparent deadline – a deadline not listed in an application manual or other supplemental instructions – would prevent a faculty member from being reappointed and promoted

17

altogether when said faculty member was otherwise qualified and had excellent criteria for promotion and tenure, including a federal grant proposal in process.

51.    The APT Manual was revised in July 2008 to include new language that a faculty member completing a promotion package must provide the names of four references at least six (6) months prior to the submission of the promotion package to the Department.    This language was not in the APT Manual at the time Plaintiff was completing her promotion package.

52.    Upon receipt of Defendant Peterson's aforementioned April 4, 2007 letter, Plaintiff sent an email and letter dated April 23, 2007 to the SPH Dean, Defendant Rimer, with a detailed accounting of what had happened and appealed to her for assistance. Plaintiff had already included Dean Rimer on the email exchanges between Plaintiff and the Department on this issue in March 2007 such that Plaintiff's April 23, 2007 letter would not have been the first time Plaintiff attempted to make Defendant Rimer aware of the situation.

53.    In her April 23, 2007 letter to Defendant Rimer Plaintiff raised three main issues: 1) That the department chair, Defendant Peterson, had obstructed her submission of a promotion package; 2) That such action indicated that Defendant Peterson was unlikely to provide future support for Plaintiff's career and development; and 3) That these actions had taken place in the context of a department that, for five years, had

18

excluded Plaintiff and failed to provide support for her research, scholarship, and teaching.

54.     Defendant Rimer did not respond to Plaintiff's April 23, 2007 letter until May 15, 2007, *after* the Department deadline of May 1, 2007 had already passed. Defendant Rimer explicitly stated in her letter that she would not address the three issues raised in Plaintiff's April 23, 2007 letter. Defendant Rimer indicated that she agreed with Defendant Peterson's decision and that because Plaintiff had now missed the May 1, 2007 deadline for submission of the promotion package, there was nothing she could do. Defendant Rimer stated finally that she would help Plaintiff explore opportunities *outside* the University.

55.     From approximately April 2007 to September 2007, Plaintiff endeavored to work with Defendant Rimer regarding transfers to other departments within the University and only at the end of this large span of time did Defendant Rimer inform Plaintiff that this would be impossible.  Throughout this period, Plaintiff continued to express to Defendant Peterson, Defendant Rimer, and other University officials her desire to turn in her promotion package.  Because the deadline to inform Plaintiff of the University's reappointment decision was not until November 30, 2007, there would still have been time to review Plaintiff's promotion package if the Defendants had wanted to assist Plaintiff in her desire to be considered for promotion and tenure.

19

56.     On September 14, 2007, Defendant Rimer suggested to Plaintiff for the first time, via email, that Plaintiff ask Defendant Peterson about getting an "after-the-fact waiver of the [May 1, 2007] deadline" for submitting her promotion package. Prior to this email, Plaintiff had never been informed of the possibility of obtaining such an "after-the-fact waiver."

57.     On September 17, 2007, Plaintiff contacted Defendant Peterson via email regarding the possibility of receiving the "after-the-fact waiver" suggested by Defendant Rimer. Defendant Peterson responded via email that a waiver was *no longer* an option at that point. Plaintiff interpreted this response to mean that a waiver might in fact have been an option at some point in the past. Plaintiff contends that neither Defendant Peterson nor any other University official had made Plaintiff aware of such an option and instead continued to advise Plaintiff that she could not submit her promotion package.

58.     Such delays and insincere attempts to assist Plaintiff in submitting her promotion package are evidence of further discrimination and maltreatment intended to thwart Plaintiff's efforts and opportunities to remain employed by the University.

59.     As alleged hereinabove, Defendant Peterson would not accept Plaintiff's promotion package from April 4, 2007 onward, even prior to the May 1, 2007 Department deadline. However, Plaintiff was able to tender her promotion package to Defendant Peterson, with the assistance of legal counsel, on or about October 24, 2007 via Federal Express courier service.

60.     Upon receipt of Plaintiff's promotion package, at no point did Defendant
Peterson inform Plaintiff: a) that he or the University would be unable to review
Plaintiff's promotion package due to any previously missed deadlines; b) that any
information or documents were missing from the promotion package thereby preventing
review of the same; and/or c) that there was inadequate time for the MCH Department,
and all relevant higher University officials or bodies, to review the promotion package
prior to the November 30, 2007 decision deadline.

61.     In a letter to Plaintiff dated November 19, 2007, Defendant Peterson
indicated that "after careful consideration of [Plaintiff's] proposed reappointment and
promotion from assistant professor to associate professor with permanent tenure and after
consultation with the assembled full professors of the Department of Maternal and Child
Health, I regret to inform you that you will not be reappointed when your current
probation term of appointment expires on November 30, 2008."

62.     Defendant Peterson's November 19, 2007 letter also indicated that
Plaintiff's submission of her package through legal counsel on October 24, 2007 was
"seven months after the March deadline and left insufficient time" for the University's
multi-layered review process.   Plaintiff's promotion package was due to the Department
on May 1, 2007, not in March, and, as of April 4, 2007, Defendant Peterson had
prevented Plaintiff from submitting her package.   Further, as alleged hereinabove,
Plaintiff explicitly and repeatedly stated verbally, via email, and in letters to Defendants

21

Peterson and Rimer that she desired to submit her promotion package and was told she could not. Plaintiff therefore contends that the Defendants created and perpetuated the additional delay between April 2007 and October 2007.

63.    Plaintiff did not find out until much later that her promotion package, a three-inch thick, extensive submission, had not been reviewed by the full professors despite Defendant Peterson's characterization in his November 19, 2007 letter of the reviewing professors' "careful consideration" of Plaintiff's reappointment and promotion. Instead, Defendant Peterson presented to the full professors Plaintiff's June 2007 Annual Review, a list of Plaintiff's current manuscripts, courses, and grants, and a memorandum written by Defendant Kotch in September of 2004 regarding Plaintiff's strengths and weaknesses in relation to her reappointment three years prior.

64.    Defendants' first stated reason for their decision not to reappoint or promote Plaintiff was that Plaintiff did not submit her promotion package by May 1, 2007. As heretofore alleged herein, Plaintiff was unilaterally blocked by Defendant Peterson from doing so. The second reason for Defendants' decision not to reappoint or promote Plaintiff was Plaintiff's research productivity, namely that her number of "peer-reviewed publications" was considered to be lower than expected for those granted tenure.

65.    Plaintiff alleges that she, the only African-American junior faculty member on the tenure track in the Department, was not afforded the same amount and/or caliber

22

of opportunities that non-African-American junior faculty members within the MCH Department were afforded to co-author or to be secondary authors on publications. Specifically, Plaintiff alleges that as a direct consequence of the actions, attitudes, and behavior exhibited by Defendant Kotch and other non-African-American senior faculty within the Department, she was isolated and alienated in a way that led other faculty not to want to associate with Plaintiff or invite her to collaborate on their publications, despite Plaintiff's diligent efforts to initiate, pursue, and maintain such associations and relationships as alleged herein.

66.    According to the APT Manual, the decision to reappoint a faculty member is based upon numerous factors. The three major elements comprising the "major criteria by which appointments, promotion and tenure are judged" are research, teaching, and practice. The documents and information included in Plaintiff's extensive promotion package evidence her exemplary contributions to, and impact on, research, teaching, and practice as well as demonstrate Plaintiff's exemplary University citizenship and service. The APT Manual details "other factors" that are taken into consideration in evaluating faculty members seeking reappointment and promotion; these other factors are also demonstrated by Plaintiff's extensive promotion package and/or her scholarly record with the University.

67.    Prior to Plaintiff's actual knowledge of Defendant UNC's decision not to reappoint or promote Plaintiff, Plaintiff filed a Grievance Complaint on November 21,

2007, based on racial discrimination and harassment, pursuant to the University's Racial Harassment Policy ("the Policy"), which has since been revised.

68.     Grievance complaints filed under the Policy as written at that time were to be reviewed by the University's *Faculty Grievance Committee* and put on fast-track timelines, including a detailed 30-day response by the University. However, Defendant UNC categorically decided that Plaintiff's Grievance Complaint would not be heard by the Faculty Grievance Committee and would instead be lumped together with Plaintiff's separate appellate claims regarding Defendant UNC's decision not to reappoint or promote, which were to be heard by a different body, the *Faculty Hearings Committee*. This decision prevented Plaintiff from pursuing her racial Grievance in accordance with the Policy, which would have provided Plaintiff a different forum and more time to present her case.

69.     With respect to the University's decision not to reappoint and not to promote Plaintiff, Plaintiff has diligently followed the University's internal administrative policies regarding nonreappointment, which resulted in a long and delayed process. As required by these policies:

(a)     In December 2007, Plaintiff met with Defendant Peterson;

(b)     In January 2008, Plaintiff met with Defendant Rimer;

(c)     On February 28, 2008, the Faculty Hearings Committee heard Plaintiff's matter;

24

(d)     On or about March 25, 2008, the Faculty Hearings Committee sent a letter with its findings and recommendations to the former Chancellor Jim Moeser to uphold the decision not to reappoint or promote Plaintiff.  Pursuant to the University's procedures, Plaintiff was not privy to this particular stage.  Thus she heard nothing about the February Faculty Hearing until three months later, via the Chancellor's letter referenced in subsection (e) below;

(e)     On or about May 23, 2008, Chancellor Moeser wrote a letter to Plaintiff approving the recommendations of the Faculty Hearings Committee and upholding the Department's decision;

(f)     On or about June 3, 2008, Plaintiff appealed to the final reviewing body, the Board of Governors;

(g)     On or about August 12, 2008, Plaintiff submitted her "Position Statement" to the Board of Governors; and

(h)     On or about August 29, 2008, Defendant UNC submitted its "Position Statement" to the Board of Governors.

70.     As of the date of the filing of Plaintiff's initial complaint in this action on November 23, 2008, the Board of Governors had not reached its decision, and it was unclear whether the Board of Governors had even begun reviewing the extensive record. Defendant UNC informed Plaintiff on or about September 9, 2008 that the Board of

25

Governors would likely not reach a final decision until the end of 2008, *after* Plaintiff's scheduled termination date of November 30, 2008.

71.    In December of 2008, Plaintiff inquired again about the status of her appeal to the Board of Governors and on or about January 9, 2009, the Board of Governors finally issued its decision, which was to uphold the Chancellor's decision not to reappoint Plaintiff or grant her tenure.

72.    In 2007, in conjunction with her former position at the University as assistant professor and prior to the adverse employment decision made by the University against her, Plaintiff received a "fundable score" for the federal NIH grant entitled "Migration and Access to Care: An Innovative Population-Based Sampling Strategy," which is the research grant referenced herein. A "fundable score" means that the grant will in fact be awarded, although the actual paperwork and monies may come subsequently. As such, although the official date on paper for the grant is February 2008, the Defendants knew or should have known, prior to making the negative adverse employment decision against Plaintiff in November of 2007, that Plaintiff had successfully obtained the grant.

73.    Plaintiff was the "Principal Investigator" on the grant, which means that the grant was awarded based on her individual research and expertise, that she was qualified to direct the research project, that she would oversee the scientific and technical aspects of the grant, and that she would handle the day-to-day management of the research.

26

74.    In a letter to Plaintiff dated September 9, 2008, Defendant Peterson gave Plaintiff just three options for how to "dispose" of the grant: 1) keep the grant with the University and remove Plaintiff as Principal Investigator; 2) transfer the grant to an academic or research organization other than the University; or 3) terminate the grant and return all unspent funds to NIH. Plaintiff's NIH program officer informed her that the grant must be affiliated with a "population center." There is only one population center in the state of North Carolina, the Carolina Population Center, to which Plaintiff's grant is currently tied. Therefore, to continue working on the grant, Plaintiff had to search for a *qualified*, out-of-state institution to transfer the grant to.

75.    Because of the negative impact on Plaintiff's career and other setbacks resulting from the ongoing and delayed University appellate process with the Board of Governors, Plaintiff was not left with any tangible, realistic, or commensurate options after November 30, 2008.

76.    Plaintiff's specific work during her seven years with the University in her unique field, which pertains to health and access to care for children of migrants, immigrants, and refugees, has placed her in a small group of research experts nationwide. Plaintiff avers that migration is currently reshaping the social and demographic characteristics of the country, including the state of North Carolina. Plaintiff's field of research and the manner in which she has excelled in the same, including nationwide

27

recognition and impact, is important to the institutional needs of the University and the public at large.

## COUNT ONE
### AS TO DEFENDANTS PETERSON, KOTCH, RIMER, FOSTER, AND MARTIN
### IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES
#### (Employment Discrimination in violation of 42 U.S.C. §1981 and 42 U.S.C. §1983)

77.     Paragraphs 1-76 above are realleged as if fully set forth herein in writing together with the Affidavit of Andrea C. Weathers, filed on November 23, 2008.

78.     This claim arises under federal law and is brought pursuant to the Civil Rights Act of 1866, as amended by Section 101 of the Civil Rights Act of 1991, codified in 42 U.S.C. §1981 ("Section 1981") and 42 U.S.C. §1983 of The Civil Rights Act of 1871 (Section 1983), based on disparate treatment.

79.     Pursuant to Section 1981, "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other...[and] the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Section 1981 prohibits all forms of racial discrimination in employment, including discrimination

28

in hiring and firing, promotions and demotions, transfers, unequal pay, racial harassment, and other discrimination in the terms and conditions of employment.

80. Section 1983 provides, in part, that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

81. Section 1983 is the federal remedy for violation of the rights guaranteed in, and protected by, Section 1981.

82. Plaintiff, an African American, is a member of a protected class and is entitled to the protections and benefits afforded by Section 1981 and Section 1983.

83. Defendants Peterson, Rimer, Kotch, Foster, and Martin are "person[s]" for purposes of Section 1983.

84. On or about November 19, 2007, Defendant Peterson unjustly denied Plaintiff's reappointment and promotion to a tenured faculty position, thereby terminating Plaintiff's employment effective November 30, 2008.

85. As alleged hereinabove in paragraph 61, in a letter to Plaintiff dated November 19, 2007, Defendant Peterson informed Plaintiff that she would not be reappointed at the end of her term on November 30, 2008 after "consultation with the

29

assembled full professors of the Department." Upon information and belief, Defendant Kotch was at that time and still is a full professor in the Department and was therefore involved in the decision not to reappoint or promote Plaintiff, which Defendant Kotch has also confirmed his affidavit filed in this action on or about November 27, 2008.

86.     In Defendant Peterson's November 19, 2007 letter to Plaintiff, he referenced section 4b of the 'UNC-Chapel Hill Trustee Policies and Regulations Governing Academic Tenure' which states that "within 10 days after receiving written notice of nonreappointment, a faculty member may in writing request a private conference with the *officer of administration* who made the decision." Plaintiff elected to have this private conference and it was with Defendant Peterson.

87.     Defendant Peterson wrote another letter dated November 19, 2008 to Defendant Rimer in which he stated "this letter is to notify you of the decision of the *Department of Maternal and Child Health* not to reappoint [Plaintiff]."

88.     In his affidavit filed in this action on or about November 27, 2008, Defendant Peterson states in paragraph 27 that it was "*my* decision not to reappoint [Plaintiff]."

89.     Following the hearing with the Faculty Hearings Committee, which was part of the administrative appeal process with the University initiated by Plaintiff, in a letter dated May 23, 2008, former Chancellor James Moeser informed Plaintiff and Defendant Peterson that he concurred with the Faculty Hearings Committee's

30

recommendations and would "uphold the decision of the *Department of Maternal and Child Health* not to reappoint [Plaintiff]."

90.     Upon information and belief, the Department's decision was based on the votes of the assembled full professors in the department: Defendant Kotch, Defendant Martin, and Defendant Foster.

91.     Upon information and belief, the Department's decision not to reappoint or promote Plaintiff, through Defendant Peterson and the Department's full professors, was in all likelihood the final decision.

92.     At all times pertinent to the allegations contained in this Complaint, Plaintiff was qualified for her job, and she performed her research, teaching, service, and other job duties effectively and successfully.  Further, Plaintiff was qualified for the promotion from assistant professor to associate professor with tenure.

93.     Defendants' proffered reasons for Plaintiff's nonreappointment, non-promotion, and termination are a mere pretext for racial discrimination.  Alternatively, race was otherwise a motivating factor in the adverse action taken by the Defendants.

94.     Defendants have discriminated against Plaintiff based on her race in violation of Section 1981 and Section 1983 as alleged herein by denying her the same rights as enjoyed by Caucasian or non-African-American employees, specifically junior faculty members on the tenure track, with regard to the making, performance, modification and termination of the employment relationship with Defendant UNC and

31

with regard to the enjoyment of all benefits, privileges, terms and conditions of that relationship.

95.    Defendants acted under color of state law.

96.    As a result of Defendants' actions under color of state law, Plaintiff has suffered a deprivation of her equal protection under the U.S. Constitution amended XIV, §1 and the North Carolina Constitution Article 1, § 19.    Specifically, the Defendants' official policy or custom stated hereinabove proximately caused the underlying racial discrimination in violation of Section 1981 and Section 1983.

97.    Plaintiff is entitled the injunctive relief requested herein and in her prior motions for temporary restraining order and preliminary injunction where still applicable from Defendants Peterson, Kotch, Rimer, Foster, and Martin in their official capacities.

98.    Plaintiff is entitled to compensatory damages from Defendants Peterson, Kotch, Rimer, Foster, and Martin in their individual capacities.

## COUNT TWO
## AS TO DEFENDANT UNC
### (Employment Discrimination in violation of Title VII)

99.    Paragraphs 1-98 above are realleged as if fully set forth herein in writing, together with the Affidavit of Andrea C. Weathers, filed on November 23, 2008.

100.    This claim arises under federal law and is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq (Title VII), based on disparate treatment and/or disparate impact.

32

101. Plaintiff, an African American, is a member of a protected class and is entitled to the protections and benefits afforded by Title VII.

102. Defendant UNC is a person within the meaning of 42 U.S.C. §2000e(b).

103. Title VII provides, in part, that "It shall be an unlawful practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race . . ." 42 U.S.C. §2000e-2(a).

104. On or about November 19, 2007, Defendant UNC via Defendant Peterson unjustly denied Plaintiff's reappointment and promotion to a tenured faculty position, thereby terminating Plaintiff's employment effective November 30, 2008.

105. At all times pertinent to the allegations contained in this Complaint, Plaintiff was qualified for her job, and she performed her research, teaching, service, and other job duties effectively and successfully. Further, Plaintiff was qualified for the promotion from assistant professor to associate professor with tenure.

106. Defendant UNC's proffered reasons for Plaintiff's nonreappointment, non-promotion, and termination are a mere pretext for racial discrimination. Alternatively, race was otherwise a motivating factor in the adverse action taken by Defendant UNC.

107. A proximate cause of Defendant UNC's adverse action against Plaintiff was the fact that Plaintiff was African American.

108.  Defendant UNC's conduct and actions have caused Plaintiff to suffer substantial personal injuries and damages, including but not limited to anxiety, stress, mental anguish, pain and suffering, inconvenience, emotional distress, humiliation and embarrassment.  Plaintiff is therefore entitled to compensatory damages from Defendant UNC.

109.  Defendant UNC has engaged in intentional discrimination and/or has engaged in acts with malice or with reckless indifference to Plaintiff's federally protected rights in that it had at least some awareness that its conduct may have been in violation of federal law.  Therefore, Plaintiff is entitled to an award of punitive damages.

110.  Plaintiff is entitled to have and recover of Defendant UNC attorney's fees pursuant to 42 U.S.C. §1988(b).

111.  Plaintiff is entitled to injunctive relief based on Defendant UNC's intentional discriminatory employment practices.

112.  Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") based on race, color, and retaliation on or about April 8, 2008, which was within 180 days of her notice of Defendant UNC's adverse employment decision.

113.  On or about December 23, 2008, Plaintiff received from the EEOC her Dismissal and Notice of Rights Letter, also known as a 'right-to-sue letter.'

34

114. On or about January 9, 2009, the Board of Governors issued its decision regarding Plaintiff's appeal within the University (as referenced in paragraphs 69-71 hereinabove).

115. Plaintiff has exhausted all of her administrative remedies related to filing a claim pursuant to Title VII for racial discrimination.

## COUNT THREE
## AS TO DEFENDANT UNC
### (Violation of Due Process under the U.S. and North Carolina Constitutions)

116. Paragraphs 1-115 above are realleged as if fully set forth herein in writing, together with the Affidavit of Andrea C. Weathers, filed on November 23, 2008.

117. Defendant UNC's decision to not reappoint and not promote Plaintiff to a tenured position was based on race and therefore deprived Plaintiff of her equal protection under the U.S. Constitution amended XIV, §1 and the North Carolina Constitution Article 1, § 19.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

1. That the Court issue injunctive relief requiring that Defendants Peterson, Kotch, Rimer, Foster, and/or Martin in their official capacities pursuant to Section 1981 and 1983 be:

(a) ORDERED to reinstate Plaintiff to her former position as an assistant professor on the tenure track within the Department of Maternal and Child Health;

35

(b)    ENJOINED from hiring a replacement to fill Plaintiff's former position, pending a decision on her reinstatement;

(c)    ENJOINED from engaging in any further adverse, discriminatory or retaliatory action against Plaintiff, including but not limited to any actions related to the transferring of the federal grant with NIH entitled "Migration and Access to Care: An Innovative Population-Based Sampling Strategy" to Johns Hopkins University;

(d)    ENJOINED from disseminating information injurious to the professional or personal reputation of Plaintiff; and

(e)    ORDERED to pay Plaintiff's attorney's fees;

2.    That the Court issue injunctive relief requiring that Defendant UNC pursuant to Title VII and the Court's equitable powers be:

(a)    ORDERED to reinstate Plaintiff to her same position as an assistant professor on the tenure track within the Department of Maternal and Child Health;

(b)    ENJOINED from hiring a replacement to fill Plaintiff's position pending a decision on her reinstatement;

(c)    ENJOINED from engaging in any further adverse, discriminatory or retaliatory action against Plaintiff, including but not limited to any actions related to the transferring of the federal grant with NIH entitled "Migration and Access to Care: An Innovative Population-Based Sampling Strategy" to Johns Hopkins University;

36

(d)     ENJOINED from disseminating information injurious to the professional or personal reputation of Plaintiff; and

(e)     ORDERED to pay Plaintiff's attorney's fees;

3.     That Plaintiff be awarded compensatory damages, including but not limited to lost wages, benefits, and all other rights and benefits incident to her employment and position with the University, and for punitive damages, against Defendant UNC for violation of Title VII, if and to the extent permitted by law;

4.     That Plaintiff be awarded compensatory damages, including but not limited to lost wages, benefits, and all other rights and benefits incident to her employment and position with the University, and for punitive damages, against the relevant Defendants in their individual capacities for violation of Section 1981 and Section 1983, if and to the extent permitted by law;

5.     That the Court award Plaintiff her costs, including attorney's fees, pursuant to 42 U.S.C. §§1981, 1983, 1988 and/or Title VII as may be allowed by law;

6.     That Plaintiff be approved for reappointment with Defendant UNC, specifically by promotion to the rank of associate professor with tenure; and

7.     That the Court grant such other and further relief as it deems just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all claims so triable.

37

Dated: February 2, 2009           Respectfully submitted,

/s/ Dieter Mauch
North Carolina State Bar Number: 16735
Hedrick Murray Bryson Kennett Mauch & Connor, PLLC
Attorneys for Plaintiff
3511 Shannon Rd, Suite 200
Durham, North Carolina 27707
Telephone: (919) 419-3300
Facsimile: (919) 419-1600
Email: dmauch@hedrickmurray.com

**STATE OF NORTH CAROLINA**

**COUNTY OF DURHAM**

**VERIFICATION**

ANDREA C. WEATHERS, being first duly sworn, deposes and says that she is the Plaintiff in this action; that she has read the foregoing Second Amended Civil Complaint and that the same is true of her own knowledge except as to those matters and things therein stated upon information and belief, and as to those she believes them to be true.

_____
ANDREA C. WEATHERS

This the 2nd day of February, 2009.

Signed and sworn to before me by Andrea C. Weathers, this 2nd day of February, 2009.

_____
Notary Public

My commission expires: __8/3/13__

```
ANDREA W MORELOS
Notary Public
Durham County
North Carolina
My Commission Expires Aug 3, 2013
```