UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ANDREA C. WEATHERS )
                          )
        Plaintiff,        )
                          )
   v.                     )     1:08CV847
                          )
UNIVERSITY OF NORTH CAROLINA )
AT CHAPEL HILL, HERBERT B.  )
PETERSON, JONATHAN KOTCH,    )
BARBARA K. RIMER, EDWARD M.  )
FOSTER, SANDRA L. MARTIN     )
                          )
        Defendants.       )



## MEMORANDUM OPINION AND ORDER

OSTEEN, JR., District Judge

Plaintiff filed a Verified Second Amended Complaint (Doc. 29) naming as defendants the University of North Carolina at Chapel Hill, Herbert B. Peterson, Jonathan Kotch, Barbara K. Rimer, Edward M. Foster, and Sandra L. Martin. Plaintiff's claims include employment discrimination in violation of 42 U.S.C. § 1981 and § 1983 (hereinafter "Count One") and employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), 42 U.S.C. § 2000e *et. seq.* (hereinafter "Count Two") (Ver. 2d Am. Compl. (Doc. 29) ¶¶ 78, 100.) Plaintiff alleges that, as a result of Defendants'[1]

---

[1] The term "Defendants" will be used to refer collectively to all Defendants, including Defendant UNC, Defendant Peterson, Defendant Kotch, Defendant Rimer, Defendant Foster, and Defendant Martin.

racially discriminatory conduct, she was denied reappointment and tenure. (Id. ¶ 4.)

On July 16, 2010, Defendants moved for summary judgment on both of Plaintiff's claims. (Defs.' Mot. Summ. J. (Doc. 63).) On August 18, 2010, Plaintiff filed a Memorandum in Opposition to Defendant's [sic] Motion for Summary Judgment. (Doc. 72.) Defendants filed a Reply on September 3, 2010. (Doc. 75.) Defendants' Motion for Summary Judgment is now ripe for decision from the court. For the reasons set forth below, Defendants' Motion for Summary Judgment will be granted.

## I.  FACTUAL BACKGROUND

The facts of this case, and all inferences drawn from those facts, are presented in the light most favorable to Dr. Weathers, the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).[2]

---

[2] Although all inferences are drawn in favor of Plaintiff, in some instances Defendants have provided specific information about Dr. Weathers' conduct during her employment with UNC to which Dr. Weathers has neither responded nor denied. Accordingly, these facts are considered undisputed and, therefore, adopted by this court. See Fed. R. Civ. P. 56(e)(2) (2010) (stating that a party opposing a motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial"); see also Berrigan v. Greyhound Lines, Inc., 782 F.2d 295, 299 (1st Cir. 1986) (noting that the plaintiff's "duty . . . is to create a genuine issue of material fact," which "requires considerably more than conclusions or a skeletal set of bland allegations") (internal quotation marks and citation omitted).

On or about December 1, 2001, Plaintiff Dr. Andrea C. Weathers (hereinafter "Dr. Weathers" or "Plaintiff"), an African-American female, began her employment with Defendant University of North Carolina at Chapel Hill (hereinafter "UNC" or "University") as an assistant professor on the tenure track in the Department of Maternal and Child Health (hereinafter "MCH Department"), a division of the School of Public Health. (Ver. 2d Am. Compl. (Doc. 29) ¶¶ 9, 25.) Dr. Weathers holds a Doctor of Medicine from East Carolina University, a Master of Public Health, and a Doctor of Public Health from Johns Hopkins University. (Id. ¶ 21.) At all relevant times, Dr. Weathers was the only African-American junior faculty member on the tenure track in the MCH Department. (Id. ¶ 9.)

A.    **Plaintiff's First Probationary Term**

When Dr. Weathers was first hired in December 2001, she was appointed to a standard probationary term of four years, from 2001 to 2005. (Id. ¶ 25.) Dr. Pierre Buekens was the Chair of the MCH Department at the time that Dr. Weathers joined the faculty. (Id. ¶ 26.) As the Department Chair, Dr. Beukens was Dr. Weathers' immediate supervisor. (Id. ¶ 26.)

On May 14, 2002, Dr. Beukens met with Dr. Weathers for her first annual review. (Buekens Dep. Ex. 44 (Doc. 70-2) 1.) Dr. Beukens praised Dr. Weathers for her publication record during the first semester of her employment at the University. (Id.)

3

During her first six months at UNC, Dr. Weathers wrote one (1) paper that was accepted for publication and had another article that was ready for submission. (Id.) Dr. Weathers also submitted one grant proposal to the Casey Foundation. (Id.) In his memorandum summarizing Dr. Weathers' first annual review, Dr. Beukens advised Dr. Weathers to "submit 2 to 4 manuscripts during the next year, and at least one proposal to a Federal Agency." (Id.)

In January 2003, Dr. Jonathan Kotch (hereinafter "Dr. Kotch") assumed the position of Interim Chair of the MCH Department and thereby, the role of Dr. Weathers' immediate supervisor.[3] (Kotch Aff. (Doc. 67) ¶ 1, July 15, 2010; Ver. 2d Am. Compl. (Doc. 29) ¶ 29.) At various times, Dr. Kotch attempted to assist Dr. Weathers by "encouraging productive interactions with other faculty members, making suggestions to increase the competitiveness of her grants, representing her at a team meeting of an externally-funded project at the Sheps Health Services Research Center, giving her an opportunity to develop a course entitled 'Health of Immigrant Children,' inviting her to teach a recitation on minority health in [his] Child and Family

---

[3] According to Dr. Kotch, he has "actively recruited and successfully mentored other African-American faculty members" in the MCH Department. (Kotch. Aff. (Doc. 67) ¶ 6, July 15, 2010.) Moreover, "[a]t least 17 of [his] 79 published articles have involved collaborations with African-American researchers." (Id. ¶ 7.)

4

Health Course (MHCH 211), attempting to facilitate a relationship with the Carolina Population Center, and forwarding announcements of fellowship opportunities to her attention."[4] (Kotch Aff. (Doc. 67) ¶ 5, July 15, 2010.)

---

[4] In her complaint, Dr. Weathers alleges that "[n]ot one faculty member ever . . . invited [her] to collaborate with him or her on publications." (Ver. 2d Am. Compl. (Doc. 29) ¶ 32.) In the affidavit filed with her original complaint, Dr. Weathers also points to a "[l]ack of invitations from any faculty in the Department, the School of Public Health, or the University to collaborate as a co-author on manuscripts or publications" as an example of the differential treatment to which she was subjected at UNC. (Weathers Aff. (Doc. 2) ¶ 7(c).) These allegations are ambiguous because a "lack of invitations" is not necessarily synonymous with no invitations. Furthermore, Dr. Weathers' allegation that she was not invited to "collaborate . . . on publications" does not appear to account for any invitations she received to collaborate on research "projects." (Id.; Foster Aff. (Doc. 69 ¶ 7, July 14, 2010; Rimer Aff. Ex. 8 (Doc. 65-4) D00000366-67, July 15, 2010.) In contrast, the affidavits, depositions, and exhibits produced by Defendants provide evidence of instances in which Defendants and various University faculty offered to put Dr. Weathers into contact with individuals with whom she could collaborate, even if they did not specifically offer to collaborate with her themselves. (Peterson Aff. (Doc. 66) ¶ 9, July 15, 2010; Rimer Aff. Ex. 8 (Doc. 65-4) D00000366-67, July 15, 2010; Foster Aff. (Doc. 69) ¶ 7, July 14, 2010.) Moreover, Dr. Foster states in his affidavit that he did personally invite Dr. Weathers to collaborate with him on a "project" involving data from the Fast Track project but that Dr. Weathers "indicated that it did not fit her interests." (Foster Aff. (Doc. 69) ¶ 7, July 14, 2010.) Because Dr. Weathers has neither denied these specific offers of assistance nor provided any substantive evidence to the contrary, this court concludes from the record that Defendants did offer to assist Dr. Weathers in the development of her research portfolio in the specific ways described by Defendants. See Scott v. Harris, 550 U.S. 372, 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

5

Nevertheless, at some point, Dr. Weathers' relationship with Dr. Kotch and the other faculty in the MCH Department began to deteriorate. (Ver. 2d Am. Compl. (Doc. 29) ¶ 30-31; Kotch Aff. (Doc. 67) ¶ 9, July 15, 2010.) Dr. Weathers attributes the chilling of her relationship with Dr. Kotch to his "racially discriminatory attitudes towards [her] and African Americans in general," which "permeated throughout the MCH Department and beyond." (Ver. 2d Am. Compl. (Doc. 29) ¶ 30-31.)

In particular, Dr. Weathers asserts that she "endured . . . numerous racially-based comments" by various faculty and staff during her time at UNC.[5] (Weathers Aff. (Doc. 2) ¶ 6.) For the

_____

[5] To the extent that Defendants deny that some of these comments were made, the court will resolve all conflicts in favor of Dr. Weathers. See Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979) (noting that at the summary judgment stage, the nonmoving party is entitled "to have the credibility of [her] evidence as forecast assumed, [her] version of all that is in dispute accepted, all internal conflicts in it resolved favorably to [her], [and] the most favorable of possible alternative inferences from it drawn in her behalf").
In the interest of brevity, this Memorandum Opinion and Order does not recite all of the comments alleged by Dr. Weathers; instead, this Memorandum Opinion and Order presents what appear to be the most relevant examples of the "racially-based comments" alleged by Dr. Weathers. Many of the comments referenced by Dr. Weathers were made by individuals who had no role in the decision to deny Dr. Weathers tenure. (See Weathers Aff. (Doc. 2) ¶ 6(b), (e)-(g), (I), (k).) As such, these comments "are of marginal relevance to a Title VII inquiry because they were not made by decision makers," and therefore, they are not specifically addressed in this Memorandum Opinion and Order. McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 687 (7th Cir. 1991). Additionally, none of the comments alleged by Dr. Weathers had any relationship to the employment decision in question, even though some of them were made by individuals who had a role in the decision to deny her tenure. See Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 300 (4th Cir.

purposes of this motion, this court will assume that all of the "racially-based comments" alleged by Dr. Weathers in her affidavit were, in fact, made.  (Id.)  On December 12, 2002, when Dr. Weathers and Dr. Kotch were on their way to a presentation, Dr. Kotch pointed to a picture of a jazz group on his office door and mentioned that he had once colored one of the white members in "black face," but that "'the students complained so much that they made [him] take it down.'"  (Id. ¶ 6(c).)  On another occasion in 2002, Sue Cotcamp, the Human Resources Administrator for the MCH Department, while helping Dr. Weathers fill out some paperwork, commented, "You know you're on minority money."  (Id. ¶ 6(b).) During a faculty meeting later in Dr. Weathers' first probationary appointment at UNC, a discussion took place "regarding the availability of money from the Provost's office for hiring diverse faculty."  (Id. ¶ 6(a).)  In the context of that conversation, Dr. Kotch stated, "We don't want another one

---

2010) (citing McCarthy, 924 F.2d at 686-687.) ("[I]n the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced."); Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated, and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination." (internal quotation marks and alteration omitted), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).

of those," and looked at Dr. Weathers.[6] (Id.)  In approximately

May 2004, Dr. Kotch made the following comments in an email

response to Dr. Weathers' inquiries about the MCH Department's

policy on student advising:

1)   "There is only one faculty [member] in the department
     that I am aware of (you) for whom field training seems
     to be an issue;"

2)   "I think engaging the faculty as a whole in an
     exercise to smooth out a process which is working well
     for everyone else would not be welcome by our
     colleagues and is unnecessary;"

3)   "I think it is an Andrea problem, not a departmental
     problem;"

4)   "I am advising, or guiding, you now that you are too
     picky;"

5)   "You are the outlier among all the faculty in the
     matter of strict adherence to the written Field
     Training guidelines;" and,

6)   "I have just asked the addressees in this message to
     refer further inquiries from you to me.  I think you
     are belaboring this point unnecessarily and taking too
     much of other people's time for an issue that, as I
     said [sic] my previous message [sic] is an Andrea
     problem, not a systems problem." (Id. ¶ 6(d).)

Finally, Dr. Weathers avers that she received

"disrespectful and disparaging emails from Dr. Edward Michael

Foster" (hereinafter "Dr. Foster") between March 1, 2007, and

---

[6] Dr. Kotch specifically denies both that he made this
statement and that he looked at Dr. Weathers after making such a
comment. (Kotch Aff. (Doc. 67) ¶ 8, July 15, 2010.)  However, as
the nonmoving party, Dr. Weathers is entitled to have "[her]
version of all that is in dispute accepted." Charbonnages de
France, 597 F.2d at 414.

March 14, 2007. (<u>Id.</u> ¶ 6(1).) His statements included remarks, such as:

1) "I ignored this [email] and suspect others just hit delete;"

2) "My initial reaction was 'Heck, I don't want to be involved with this student if she's going to work with Andrea. Andrea will make it tedious, time-intensive, and contentious;"

3) "If you make things unpleasant (e.g. initiating a 20-minute discussion in faculty meetings of why we don't have minutes when it's obviously due to staff turnover), no one will want to participate in other activities with you;"

4) "Andrea, if you're not satisfied with the protocols, then you should volunteer to write all this down. If you spent less time lecturing the group, your listening skills would be better and your need for written materials, less;"

5) "Rather than telling us that we ignore your interests, you might spend some time thinking about how to get students with your interest into the department;"

6) "I have responded to Andrea via the group rather than directly because we are all affected by these demoralizing and frustrating meetings;"

7) "I say we go ahead with the better student and not the one Andrea expressed an interest in at the last minute. I don't see any need to reward bad behavior." (<u>Id.</u> ¶ 6(1).)

**B.    Plaintiff's Initial Reappointment**

Because her first probationary appointment was scheduled to end in 2005, Dr. Weathers came up for reappointment in 2004. (Kotch Aff. Ex. 3 (Doc. 67-2) 1-2, July 15, 2010.) The original deadline for the submission of her reappointment application was

9

set for April 1, 2004.  (<u>Id.</u> at 1.)  In February 2004, Dr.
Weathers requested an extension of the deadline, and she was
granted until June 8, 2004, to submit her application.  (<u>Id.</u>)

On July 1, 2004, Dr. Herbert B. Peterson (hereinafter "Dr.
Peterson") replaced Dr. Kotch as the Chair of the MCH Department.
(Peterson Aff. (Doc. 66) ¶ 1, July 15, 2010.)  Dr. Weathers
informed Dr. Peterson that "she was having difficulty in
developing research collaborations."  (<u>Id.</u> ¶ 3.)  In response,
Dr. Peterson offered to help and asked Marcia Roth, the Director
for Planning and Development, to assist him in helping Dr.
Weathers.[7]  (<u>Id.</u>)  By late July 2004, Ms. Roth had identified a
grant opportunity in Dr. Weathers' area of research (children's
migrant health) and had offered to help Dr. Weathers apply for
the grant.  (<u>Id.</u>)  Over the following months, Ms. Roth developed
a list of key contacts related to Dr. Weathers' research agenda,
identified another grant opportunity for Dr. Weathers
(Donors4PublicHealth), and assisted Dr. Weathers in preparing the
grant application. (<u>Id.</u>)

In September 2004, the full professors in the MCH Department
considered Dr. Weathers' application for reappointment to a
second probationary term. (Peterson Aff. Ex. 4 (Doc. 66-4) 1,
July 15, 2010.)  When her application for reappointment was
considered, Dr. Weathers had three (3) publications in refereed

_____

[7] <u>See</u> <u>supra</u> note 4.

10

journals and three (3) additional works under development. (Id.)
Dr. Weathers was also a co-investigator on two (2) grants and had
submitted two (2) applications for NIH grants. (Id.)

As the Chair of the Full Professors' Committee, Dr. Kotch
wrote a memo to Dr. Peterson detailing the full professors'
discussions concerning Dr. Weathers' reappointment. (Id.) In
the memo, Dr. Kotch noted the full professors' concern that "[Dr.
Weathers'] pace of publications, if not increased, will not lead
in three years to a publication record sufficient for promotion."
(Id.) Moreover, Dr. Kotch also expressed their reservation that
Dr. Weathers' three (3) publications were "all based on her
dissertation research or earlier work . . . leading to the
conclusion that [Dr. Weathers] has no publication based on any
work she has done since joining the department." (Id.) The full
professors also noted that "Dr. Weathers has had difficulty
serving as an advisor of Master's students." (Id. at 2.) In
fact, "[t]wo of her three 2002-03 Master's advisees requested and
received permission to switch advisors after one year." (Id.)
Dr. Kotch's memo also addressed the full professors' concerns
about Dr. Weathers' collegiality: "Dr. Weathers has created the
impression that she has little interest in collaboration that
does not directly address her immediate needs. At the same time,
she has been critical of a perceived unwillingness on the part of
other MCH faculty to collaborate with her." (Id. at 3.)

Although the three (3) full professors ultimately voted 2-to-1 in favor of reappointing Dr. Weathers, the two (2) voting in favor of her reappointment "[did] so with serious reservations."[8] (Id. at 1, 3.) Dr. Kotch's memo acknowledged the full professors' corresponding "responsibility to work with Dr. Weathers to achieve academic success and promotion." (Id. at 3.) Nevertheless, Dr. Kotch reiterated the full professors' position that "[s]hort of [Dr. Weathers] responding positively to such encouragement and support, a recommendation that she be promoted [in three years] is not likely." (Id.)

Following the vote and report of the Full Professors Committee, Dr. Peterson made a recommendation to Interim Dean Margaret Dardess (hereinafter "Dean Dardess") that Dr. Weathers be reappointed for a second probationary term. (Peterson Aff. Ex. 5 (Doc. 66-5) 1, July 15, 2010.) In his letter to Interim Dean Dardess, Dr. Peterson expressed his belief that Dr. Weathers had "potential to be an outstanding faculty member" and "to make important contributions to the missions of the Department and the School of Public Health." (Id. at 1-2.) Although Dr. Peterson noted his concern that Dr. Weathers' "pace of publications would

---

[8] In his July 15, 2010, affidavit, Dr. Kotch admitted that he voted against Dr. Weathers' reappointment due to his belief that "her academic record would be insufficient to justify promotion and tenure under the Department's standards in three (3) years" and to his concerns about Dr. Weathers' "deficiencies . . . [in] teaching load, advising, and collegiality." (Kotch Aff. (Doc. 67) ¶ 11, July 15, 2010.)

not likely lead to promotion in three years," he also expressed his belief that Dr. Weathers "[was] highly motivated to increase her publication record." (Id. at 1.) Based upon Dr. Peterson's recommendation, Dean Dardess also recommended the reappointment of Dr. Weathers to the Health Sciences Advisory Committee (hereinafter "HSAC"). (Peterson Aff. (Doc. 66) ¶ 6, July 15, 2010; see also Peterson Aff. Ex. 6 (66-6) 1, July 15, 2010.)

Following HSAC's review of Dean Dardess' recommendation, Dr. Steve Allred (hereinafter "Dr. Allred") wrote to Dean Dardess on behalf of HSAC to express their "serious reservations" about "Dr. Weathers' prospects for attaining promotion and tenure." (Peterson Aff. Ex. 6 (66-6) 1, July 15, 2010.) Dr. Allred stated that HSAC was concerned about Dr. Weathers' scant publication record, which they felt "[was] not at the level typical of School of Public Health faculty at this stage of their careers," Dr. Weathers' ability to meet "such basic faculty responsibilities as attending doctoral committee meetings and faculty meetings," and Dr. Weathers' abilities as an advisor. (Id.) As a result, HSAC directed Dr. Peterson to formulate a written mentoring plan for Dr. Weathers and to appoint a senior faculty mentor to assist Dr. Weathers during her second probationary term. (Id.)

In response to HSAC's requests, Dr. Peterson initially sought to designate a senior faculty member, Dr. Sandra L. Martin (hereinafter "Dr. Martin"), to mentor Dr. Weathers, but Dr.

13

Weathers refused to allow Dr. Martin or any other member of the MCH Department to serve as her mentor. (Peterson Aff. (Doc. 66) ¶ 7, July 15, 2010.) As an alternative approach, Dr. Peterson proposed the creation of a Mentoring Committee to assist Dr. Weathers. (Id.) The Mentoring Committee consisted of Dr. Kerry Kilpatrick, who agreed to serve as the chair of the committee, Dr. Jo Anne Earp, and Dr. Jan Dodds.[9] (Id. ¶ 8.) The creation of such a Mentoring Committee to assist a junior faculty member was unprecedented in the MCH Department. (Id. ¶ 7; see also Rimer Aff. (Doc. 65) ¶ 7, July 15, 2010.)

Dr. Weathers first met with the Mentoring Committee on February 14, 2005. (Rimer Aff. Ex. 8 (Doc. 65-4) D00000364, July 15, 2010.) In an earlier meeting without Dr. Weathers, the Mentoring Committee agreed to offer *inter alia* the following assistance to Dr. Weathers: 1) to read Dr. Weathers' grant proposals and pink sheets in order to provide an objective view of her proposals and the reviewers' concerns, 2) to read and comment on her papers in progress, and 3) to suggest other faculty with whom she could collaborate on research projects in

---

[9] As the Associate Dean for Graduate Studies, Dr. Kilpatrick had participated in the creation of the guidelines for promotion and tenure. (Peterson Aff. (Doc. 66) ¶ 8, July 15, 2010.) Dr. Jo Anne Earp had served for many years as a faculty mentor and later received the 2008 Faculty Mentoring Award. (Id.) Dr. Jan Dodds was a member of the School of Public Health's Appointments, Promotions, and Tenure Committee, and she later went on to become the head of the School of Public Health's mentoring program. (Id.)

her area of expertise.[10]  (Id. at D00000363-64.)  During the
February 14, 2005, meeting, the Mentoring Committee informed Dr.
Weathers that "persons being considered for promotion to
associate professor within the School of Public Health would
typically have a minimum of between 15 and 20 publications,
though most have had many more."  (Id. at D00000365.)  The
committee members suggested to Dr. Weathers that she may be
"limiting her [research] opportunities by concentrating too
narrowly on the health effects of geographic mobility."  (Id.)
Dr. Weathers responded by saying, "'What I do is what I do.  I'll
not do something to get tenure and then do something else later
on.'"  (Id. at D00000366.)

      During their second meeting with Dr. Weathers on March 1,
2005, the Mentoring Committee proposed that Dr. Weathers
temporarily transfer from the tenure-track to a fixed-term
appointment so that she could build up her research and
publication portfolios before eventually transferring back to the
tenure-track appointment.  (Id.)  Dr. Weathers told the committee
that she would rather remain on the tenure-track because she felt
that a fixed-term appointment was not as prestigious as a tenure-
track appointment. (Id.)  The committee members then suggested
numerous possible collaborative relationships with investigators
at UNC who might share some of Dr. Weathers' research interests

---

[10] See supra note 4.

15

and helped to initiate contact between the investigators and Dr. Weathers[11]. (Id. at D00000366-67.) For the most part, Dr. Weathers either refused to work with those investigators or did not follow up with them to pursue collaboration.[12] (Id.) On April 13, 2005, the Mentoring Committee presented Dr. Weathers with a proposed mentoring plan to guide her research and publication efforts so that she would be on track for obtaining tenure in three (3) years. (Id.) Dr. Weathers subsequently rejected the proposed mentoring plan as "premature." (Id. at D00000369.)

On June 1, 2005, Defendant Barbara K. Rimer (hereinafter "Dean Rimer") became the Dean of the School of Public Health at UNC. (Rimer Aff. (Doc. 65) ¶ 1, July 15, 2010.) Dean Rimer met with Dr. Weathers during her first two (2) months as Dean and on at least four (4) other occasions during the following three (3) years. (Id. ¶ 3) Moreover, Dean Rimer responded to over fifty (50) emails from Dr. Weathers and wrote her multiple letters. (Id.)

According to Dean Rimer, she "provided more support and assistance to Dr. Weathers than to all other junior faculty

---

[11] See supra note 4.

[12] Dr. Weathers did meet with Dr. Bob Konrad of the Sheps Center for Health Services Research several times to review his available data sets. (Rimer Aff. Ex. 8 (Doc. 65-4) D00000367, July 15, 2010.) However, it is unclear from the record whether Dr. Weathers' collaboration with Dr. Konrad ever resulted in any sort of tangible collaboration or publication.

16

members in the School - combined." (Id. ¶ 4) In addition to Dean Rimer's assistance, Dr. Peterson met with Dr. Weathers twenty-one (21) times in 2005. (Peterson Aff. (Doc. 66) ¶ 2, July 15, 2010.) Dr. Peterson also initiated a relationship between Dr. Weathers and the Carolina Population Center (hereinafter "CPC") that ultimately led to CPC's decision to support one (1) of Dr. Weathers' grant applications. (Id. ¶ 9.) Additionally, Dr. Peterson nominated Dr. Weathers for the William T. Grant Scholars Program and wrote a letter of support for her. (Id.) Dr. Weathers, on the other hand, never applied for a grant from the program. (Id.) In November 2005, Dr. Peterson arranged for Dr. Tim Carey, the Director of the Sheps Center for Health Services Research, to meet with Dr. Weathers about potential collaborations. (Id.) The meeting was later canceled when Dr. Weathers told Dr. Peterson that it would not be helpful. (Id.)

In September 2005, at the request of Dean Rimer, Dr. Kilpatrick prepared a summary of the Mentoring Committee's work with Dr. Weathers. (Rimer Aff. (Doc. 65) ¶ 8, July 15, 2010; Rimer Aff. Ex. 8 (Doc. 65-4) D00000362, July 15, 2010.) Dr. Kilpatrick's summary noted the Mentoring Committee's finding that Dr. Weathers was "resistant to [their] recommendations and offers of assistance." (Rimer Aff. Ex. 8 (Doc. 65-4) D00000363, July 15, 2010.) Dean Rimer forwarded a copy of Dr. Kilpatrick's summary to Dr. Weathers and offered to review it with her. (Rimer Aff.

(Doc. 65) ¶ 10, July 15, 2010.)  Dr. Weathers returned the envelope containing the report unopened.  (Id. ¶ 11.)

### C.  Plaintiff's Second Probationary Term and Application for Promotion and Tenure

Dr. Weathers' second probationary term began on December 1, 2005.  (Ver. 2d Am. Compl. (Doc. 29) ¶ 34.)  In late summer of 2005 and 2006, Dr. Weathers declined to accept advisees. (Peterson Aff. (Doc. 66) ¶ 11, July 15, 2010.)  Dr. Weathers rejected the advisees assigned to her in 2005 because "she wanted students who would be in the Department for two years (MPH) as opposed to one year (MSPH)."  (Farel Aff. (Doc. 15-7) 1, Nov. 18, 2008.)  Dr. Weathers again rejected the advisees assigned to her the following year, even though they were enrolled in the two-year MPH program.  (Id.)  In 2007, Dr. Peterson asked Dr. Weathers whether she planned to accept advisees.  (Id.)  Dr. Farel also spoke with Dr. Weathers and informed her that she could personally select the advisees she preferred.  (Id. at 2.) Dr. Weathers did not respond one way or the other to either Dr. Peterson or Dr. Farel.  (Id. at 1-2.)

On May 31, 2006, Ms. Cotcamp sent Dr. Weathers an email informing her that in order to be considered for tenure Dr. Weathers would need to submit her promotion package to Ms. Cotcamp by May 1, 2007.  (Peterson Aff. Ex. 13 (Doc. 66-9) 7, July 15, 2010.)  That email provided Dr. Weathers an eleven-month notice of the date her application for tenure would be due.  The

18

May 1 deadline was based upon the fact that the MCH Department would have to submit Dr. Weathers' promotion package to the Dean's Office of the School of Public Health by May 25, 2007. (Id.) In turn, the May 25 deadline was generated in order to comply with the Trustee Policies and Regulations Governing Academic Tenure in the University of North Carolina at Chapel Hill (hereinafter "Trustee Policies"). (Peterson Aff. Ex. 1 (Doc. 66-2) 3, July 15, 2010.) Pursuant to the Trustee Policies, an assistant professor who has been appointed to a second probationary term must be notified in writing of a decision "as to whether he or she will be reappointed upon expiration" of the second probationary term "no less than 12 months before the end of such a second term." (Id.) Because Dr. Weathers' second probationary term was scheduled to end on November 30, 2008, the University was required to notify her of their decision concerning her reappointment, promotion and tenure by November 30, 2007. (Id.; see also Peterson Aff. Ex. 17 (Doc. 66-12) 1, July 15, 2010.) No evidence has been presented that these various deadlines were unreasonable or structured differently for any other tenure applicant.

Ms. Cotcamp's May 31, 2006, email notification also directed Dr. Weathers to refer to the School of Public Health's Appointment, Promotion and Tenure Manual (hereinafter "APT Manual") for more information regarding the promotion process.

(Peterson Aff. Ex. 13 (Doc. 66-9) 7, July 15, 2010.) In response to Ms. Cotcamp's email, Dr. Weathers responded that, "although I may engage [sic] this process, I also will take steps to seek other positions." (<u>Id.</u>)

The APT manual requires that a candidate for promotion and tenure submit a complete promotion package for consideration. (Peterson Aff. Ex. 2 (Doc. 66-3) 23, 32, July 15, 2010; Peterson Aff. (Doc. 66) ¶ 13, July 15, 2010.) In addition to other materials, the promotion package must include "[f]our letters from independent, outside reviewers[,] and a copy of the letter by the Department Chair soliciting the reviews." (Peterson Aff. Ex. 2 (Doc. 66-3) 32, July 15, 2010.) Each of the four (4) letters must come "from outside the institution, all from individuals independent of the candidate, two from a list of names provided by the candidate and two from individuals selected by the Department Chair, Dean or the Dean's designee (i.e. Search Committee Chair), as appropriate." (<u>Id.</u> at 23.) These letters of recommendation must be solicited by the Department Chair, not the applicant. (<u>Id.</u> at 32; <u>see also</u> Peterson Aff. (Doc. 66) ¶ 15, July 15, 2010.)

The APT manual did not set forth a specific deadline for providing this list of references to the Department Chair. (<u>See</u> Peterson Aff. Ex. 2 (Doc. 66-3), July 15, 2010.) However, the rules set forth in the APT manual required that the review

letters be included in the promotion package. (<u>Id.</u> at 32.)
Because the review letters are solicited and obtained by the
Department Chair, Dr. Weathers had to submit a list of references
prior to the application deadline to permit Dr. Peterson to
obtain the letters for inclusion in the package submitted on May
1, 2007.[13] (<u>See Id.</u>)

On January 4, 2007, Ms. Cotcamp sent Dr. Weathers an email
reminding her of the May 1, 2007, deadline for the submission of
her promotion package. (Cotcamp Dep. Ex. 43 (Doc. 72-1) 107.)
Ms. Cotcamp also notified Dr. Weathers that "Dr. Peterson will
need a list of four independent references from whom to solicit
recommendation letters." (<u>Id.</u>) Dr. Weathers responded the
following day by simply stating, "Dear Sue, Many thanks!--acw."
(<u>Id.</u>) A month later, on February 2, 2007, Ms. Cotcamp again sent
Dr. Weathers an email reminding her to submit a list of four (4)
independent references; this time, Ms. Cotcamp asked Dr. Weathers
to provide the list of names by March 1, 2007. (<u>Id.</u> at 106-07.)
The March 1 deadline for the submission of a list of references
was a deadline chosen by Dr. Peterson based on his estimation of
the time that it would take for him to solicit the letters of
recommendation and for reviewers to write and return the letters
to him prior to the May 1, 2007, deadline for the promotion

---

[13] It therefore appears from the evidence that even if Dr.
Weathers had submitted an otherwise complete package on May 1,
2007, it would not have contained the four (4) required
independent review letters.

package.[14]  (Id. at 104-05.)  Although this deadline does not appear specifically in the APT manual, no evidence has been presented to suggest the deadline was unreasonable or improper.

On February 27, 2007, Ms. Cotcamp sent Dr. Weathers a third follow-up email requesting a list of independent references by March 1, 2007.  (Cotcamp Dep. Ex. 43 (Doc. 72-1) 106.)  Ms. Cotcamp also stated that she would be willing to give Dr. Weathers until March 8, 2007, to provide the names if she needed more time.  (Id.)  Dr. Weathers responded by asking, "Can you direct me to who is asking that these be submitted, so that I can communicate directly with them?"  (Id.)

Ms. Cotcamp responded on March 1, 2007, that references were required pursuant to the APT manual.  (Id.)  Ms. Cotcamp directed Dr. Weathers to contact Dr. Peterson if she would like to speak to a specific individual about the requirement.  (Id.)  Dr.

---

[14] Dr. Weathers argues the significance of a document found on Ms. Cotcamp's computer in February 2007 entitled "Department of Maternal and Child Health Revised Review Procedures for Faculty Promotion October 1996."  (Mem. Opp. Defs.' Mot. Summ. J. (Doc. 72) 9; see also Cotcamp Dep. Ex. 14 (Doc. 72-1) 103.) Ironically, this document stipulates that the candidate for promotion and tenure must provide a list of references to the Department Chair "no later than three months prior to the deadline for submission to the Dean's Office."  (Cotcamp Dep. Ex. 14 (Doc. 72-1) 103 (emphasis added).)  Dr. Peterson's March 1 deadline allowed Dr. Weathers to submit the list of names to him only two months prior to the May 1 deadline.  (See Cotcamp Dep. (Doc. 72-1) 80:22-81:2.)  Furthermore, Dr. Weathers has produced no evidence to show that this document was ever adopted by the MCH Department or that it was in effect in 2007 when she was considered for reappointment, promotion and tenure.  (Cotcamp Dep. (Doc. 72-1) 131:4-9.)

Weathers responded by asking why the May 2007 deadline had been moved to March 2007.  (Id.)  Dr. Peterson responded to Dr. Weathers' by explaining that the May 2007 deadline had not changed, but that the reference letters had to be solicited prior to May so that they could be included in the promotion package by the May 1 deadline.  (Id. at 105-06.)  Dr. Weathers responded by saying, "Many thanks for bringing this to my attention; now, however, if the department needed something earlier than the May deadline—which I have been made aware of—then throwing out a new deadline less than 4 weeks prior to its maturity only repeats prior patterns of failed communication from our department."  (Id. at 105.)  Dr. Peterson again responded to Dr. Weathers, explaining that the MCH Department needed the list of references in advance of the May 1 deadline to allow the reviewers ample time to write the letters and return them to Dr. Peterson by the May 1, 2007, deadline.  (Id.)  Dr. Peterson reiterated his request that Dr. Weathers submit the list of references by March 8.  (Id.)

On March 8, 2007, Dr. Weathers wrote back that she was not contesting the May deadline, but that she did not understand the addition of the March deadline.  (Id.)  The same day, Dr. Peterson replied and again explained that the March deadline only applied to the list of references, not the promotion package itself.  (Id. at 104-05.)  Dr. Peterson agreed to give Dr.

Weathers until March 15 to submit the list of names. (Id. at 105.) Dr. Weathers responded to Dr. Peterson that "[her] preference [was] to turn everything in as one package." (Id. at 104.) On March 9, Dr. Peterson again attempted to explain the need for the list of references; on March 12, 2007, Dr. Weathers again reiterated her preference to turn everything in at once. (Id.)

On March 14, 2007, Ms. Cotcamp wrote Dr. Weathers on behalf of Dr. Peterson urging Dr. Weathers to submit a list of references and extending the deadline for the submission of names to March 19, 2007. (Peterson Aff. Ex. 13 (Doc. 66-9) 2, July 15, 2010.) Dr. Weathers replied that she had "nothing new to add to [her] previous messages." (Id.) On March 18, 2007, Dr. Peterson sent an email to Dr. Weathers, stating:

> I am unable to discern, based on your responses to my requests (below), whether you intend to submit a package for promotion. If you intend to do so, please provide the list of 4 names (requested below) no later than the end of business day, Wednesday, March 21. I have extended the deadline for your submission of the names several times. No further extensions will be granted. If I do not receive your names by the end of the business day Wednesday, March 21, I will assume that you have decided not to submit a promotion package and will proceed accordingly. (Id.)

Dr. Weathers replied by stating that she "intend[ed] to submit [her] package as a unit in May."[15] (Id. at 1.) On March

---

[15] When Ms. Cotcamp reminded two other tenure candidates of the deadline for reviewer letters, those candidates submitted

21, 2007, Dr. Peterson sent Dr. Weathers a final reminder and notified her that her failure to send him the list of names by the end of the day would amount to a "decision to stop our collective efforts re: the process for applying for reappointment, promotion, and tenure." (Id.) Dr. Weathers responded that Dr. Peterson's statement was inaccurate because she could "make no decisions regarding the department's efforts." (Id.) Finally, on March 22, 2007, Dr. Peterson sent Dr. Weathers an email stating, "Since you have not responded to my repeated requests to submit these names, I cannot proceed with the process as outlined in the manual. I am sorry that you have decided not to comply with the School's process for appointments, promotions, and tenure, as that decision is also a decision to forego moving forward with your promotion package." (Id.) Dr. Peterson sent Dr. Weathers a similar letter on April 4, 2007. (Ver. 2d Am. Comp. (Doc. 29) ¶ 49.)

On April 23, 2007, Dr. Weathers sent Dean Rimer an email and letter detailing what had happened concerning the letters of reference and asking for her assistance. (Id. ¶ 52.) Dr. Weathers did not submit any type of promotion package to the MCH Department on May 1, 2007. (Weathers Dep. (Doc. 75-7) 232:1-238:16.) On May 15, 2007, Dean Rimer responded to Dr. Weathers by letter, indicating that she agreed with Dr. Peterson's
_____
their list of names within a week of Ms. Cotcamp's reminder. (Cotcamp Dep. (Doc. 72-1) 81:9-12.)

decision. (Rimer Aff. Ex. 14 (Doc. 65-8) 1, July 15, 2010.) Dean Rimer offered to help Dr. Weathers explore employment opportunities outside the University. (Id. at 2.)

On September 17, 2007, Dr. Weathers contacted Dr. Peterson to inquire about obtaining an "after-the-fact waiver" of the May 1, 2007 deadline. (Ver. 2d Am. Compl. (Doc. 29) ¶ 57.) Dr. Peterson determined that a waiver was not a possibility because of the limitations under UNC policies. (Peterson Aff. (Doc. 66) ¶ 19, July 15, 2010; Peterson Aff. Ex. 2 (Doc. 66-3) 19, July 15, 2010.) On or about October 24, 2007, over five (5) months after the May 1, 2007, deadline, Dr. Weathers tendered her promotion package to Dr. Peterson via her attorney. (Ver. 2d Am. Compl. (Doc. 29 ¶ 59.) It does not appear from the record that this package contained the four (4) independent reviewer letters as required by the rules contained in the APT Manual.

## D.    Defendants' Decision Not to Reappoint Plaintiff

According to the Trustee Policies, the Department Chair must consult with the assembled full professors of the department prior to deciding not to reappoint a faculty member upon the expiration of her probationary term. (Peterson Aff. Ex. 1 (66-2) 5, July 15, 2010.) Therefore, despite the fact that Dr. Weathers did not submit a promotion package to be considered for tenure by the MCH Department deadline, the full professors of the MCH Department still had to convene to discuss whether to reappoint

Dr. Weathers, in order to notify her of that decision one (1) year before the end of her term.[16]  (Id.)

On October 31, 2007, the full professors[17] in the MCH Department voted unanimously against recommending reappointment, promotion and tenure for Dr. Weathers.  (Kotch Aff. Ex. 16 (Doc. 67-4) 1, July 15, 2010.)  Because the full professors did not have a complete promotion package to review, the full professors reviewed a September 7, 2004, memorandum entitled "Review of Reappointment in Rank of Andrea Weathers" and a list of manuscripts, grants and courses taught that were provided by Dr. Weathers to Dr. Peterson in connection with her June 20, 2007, annual review. (Peterson Aff. (Doc. 66) ¶ 23, July 15, 2010; see also Kotch Aff. Ex. 16 (Doc. 67-4) 1, July 15, 2010.)  When the full professors voted on Dr. Weathers' promotion and tenure, Dr. Weathers had six (6) papers either in publication or in press. (Kotch Aff. Ex. 16 (Doc. 67-4) 2, July 15, 2010.)  Of those six (6) papers, "four [were] based on Dr. Weathers' dissertation which she completed prior to her arriving at UNC." (Id.)

---

[16] At her annual review in June 2007, Dr. Peterson informed Dr. Weathers of his expectation that "a decision [would] be made not to reappoint [her] after [her] current appointment expire[d] on November 30, 2008." (Peterson Aff. Ex. 15 (Doc. 66-10) 3, July 15, 2010.)

[17] According to the affidavits submitted by Defendants, the Full Professors Committee in 2007 consisted of Dr. Kotch, Dr. Martin, and Dr. Foster. (Kotch Aff. (Doc. 67) ¶ 12, July 15, 2010; Martin Aff. (Doc. 68) ¶ 8, July 15, 2010; Foster Aff. (Doc. 69) ¶ 3, July 14, 2010.)

In a letter to Dr. Weathers dated November 19, 2007, Dr.
Peterson informed Dr. Weathers that she would not be reappointed
when her current probationary term expired on November 30, 2008.
(Peterson Aff. Ex. 17 (Doc. 66-12) 1, July 15, 2010.)  Dr.
Peterson also informed Dr. Weathers that pursuant to the Trustee
Policies she had the right to request a private conference with
him to discuss the reasons for her nonreappointment.  (Id. at 2.)
Dr. Weathers met with Dr. Peterson in December 2007 and Dean
Rimer in January 2008.  (Ver. 2d Am. Compl. (Doc. 29) ¶ 69.)  On
February 28, 2008, the Faculty Hearings Committee heard Dr.
Weathers' appeal of her nonreappointment.  (Id.)  The Faculty
Hearings Committee sent then-Chancellor James Moeser (hereinafter
"Chancellor Moeser") a letter on March 25, 2008, containing its
findings and recommendations to uphold Dr. Weathers'
nonreappointment.  (Id.)  On May 23, 2008, Chancellor Moeser
notified Dr. Weathers by letter of his decision to approve the
recommendations of the Faculty Hearings Committee and to uphold
the MCH Department's decision not to reappoint her. (Id.)  Dr.
Weathers appealed to the final reviewing body for reappointment
decisions at UNC, the Board of Governors, on June 3, 2008.  (Id.)
On January 9, 2009, the Board of Governors issued its decision to
uphold Chancellor Moeser's decision not to reappoint Dr. Weathers
or to grant her tenure.  (Id.)  Dr. Weathers filed a complaint
with the Equal Employment Opportunity Commission ("EEOC") on

April 8, 2008, and received her Dismissal and Notice of Rights Letter on December 23, 2008. (<u>Id.</u> ¶ 112-13.)

## II.  ANALYSIS

### A.  Legal Standard for Summary Judgment

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that no genuine issue of material facts exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party bears the burden of initially demonstrating the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  If the moving party has met that burden, then the nonmoving party must persuade the court that a genuine issue remains for trial.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

A fact is "material" if its truth or falsity might affect the outcome of the case under the governing law.  <u>Anderson</u>, 477 U.S. at 248.  A dispute regarding a material fact is "genuine" if sufficient evidence exists such that a reasonable jury could resolve the dispute in favor of the nonmoving party.  <u>Id.</u>  "Mere allegations" in support of a party's pleadings, without "any significant probative evidence" to support those allegations, do not provide sufficient evidence to allow a reasonable jury to resolve a dispute in favor of that party.  <u>Id.</u> at 248-49

29

(internal quotation mark omitted); see also Brown v. Sears Auto.
Ctr., 222 F. Supp. 2d 757, 761 (M.D.N.C. 2002) ("[T]he non-moving
party cannot rely solely on unsupported assertions to demonstrate
that a genuine issue of material fact exists."). Put another
way, simply showing "some metaphysical doubt as to the material
facts" is not sufficient to establish a genuine dispute.
Matsushita, 475 U.S. at 586.

In considering whether a genuine issue of material fact
exists, the court must be careful not to weigh the evidence or
make credibility determinations. Anderson, 477 U.S. at 255.
Instead, the court must view the facts in the light most
favorable to the non-moving party, drawing all reasonable
inferences in favor of that party. Id. at 255. In particular,
at the summary judgment stage, the nonmoving party is entitled
"to have the credibility of [her] evidence as forecast assumed,
[her] version of all that is in dispute accepted, all internal
conflicts in it resolved favorably to [her], the most favorable
of possible alternative inferences from it drawn in [her] behalf;
and finally, to be given the benefit of all favorable legal
theories invoked by the evidence so considered." Charbonnages de
France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

When deciding whether to grant summary judgment in an
employment discrimination case, "courts must take special care
. . . because motive often is the critical issue." Ballinger v.

30

N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987).
However, the fact that motive is at issue does not mean that
summary judgment is never appropriate, since a moving party may
still be able to show that no genuine issue of material fact
exists. Ballinger, 815 F.2d at 1005.

   **B.  Title VII Claim Against Defendant UNC**

   Because Dr. Weathers has proffered no direct evidence of
discrimination, her Title VII discrimination claim is asserted
under the test set out in McDonnell Douglas Corp. v. Green, 411
U.S. 792 (1973).[18]  Under McDonnell Douglas, the plaintiff must
first present evidence of a prima facie case of discrimination.
Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53
(1981).  If a plaintiff meets the burden of presenting a prima
facie case, the defendant-employer bears the burden to
"articulate some legitimate, nondiscriminatory reason for the
employee's rejection." Id. at 253 (quoting McDonnell Douglas, 411
U.S. at 802).  At this second step, the defendant's burden is a
burden of production, rather than a burden of persuasion. St.
Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) ("[A]lthough
the McDonnell Douglas presumption shifts the burden of *production*
to the defendant, the ultimate burden of persuading the trier of
fact that the defendant intentionally discriminated against the

---

   [18] At a conference before this court on October 12, 2010,
Dr. Weathers confirmed that she is proceeding under the McDonnell
Douglas framework.

plaintiff remains at all times with the plaintiff.") (italics in original). Finally, if the employer carries his burden of production, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253.

To survive a motion for summary judgment under the McDonnell Douglas framework, the plaintiff must develop some evidence based upon which a juror could reasonably find that discrimination motivated the challenged employment action. Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004). If the plaintiff fails to prove a prima facie case of discrimination or fails to raise a genuine factual dispute concerning the employer's proffered explanation for the alleged discriminatory employment action, the defendant is entitled to summary judgment. Henson v. Liggett Grp., Inc., 61 F.3d 270, 274 (4th Cir. 1995).

### 1.   Plaintiff's Prima Facie Case

Title VII makes it unlawful for employers to "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1) (2006). Because Dr. Weathers alleges discrimination in the context of promotion and tenure, she must present evidence that: (1) she is a member of a protected group, (2) she applied for

32

promotion and tenure, (3) she was qualified for promotion and
tenure, and (4) she was rejected under circumstances giving rise
to an inference of unlawful discrimination. See Alvarado v. Bd.
of Trs. Of Montgomery Cmty. Coll., 928 F.2d 118, 121 (4th Cir.
1991) (articulating a modified McDonnell Douglas test for the
prima facie case for discrimination to be applied in failure to
promote cases); Rowe v. N.C. Agric. and Tech. State Univ., 630 F.
Supp. 2d 601, 607 (M.D.N.C. 2009) (applying the modified test set
out in Alvarado to the promotion and tenure context).

It is undisputed that, as an African-American individual,
Dr. Weathers is a member of a protected class. McDougal-Wilson
v. Goodyear Tire and Rubber Co., 427 F. Supp. 2d 595, 606
(E.D.N.C. 2006). Nevertheless, for the reasons set forth below,
Dr. Weathers has failed to establish the remaining three (3)
elements of a prima facie case as set out in Alvarado, supra.

### a.    Application for Promotion and Tenure

The first element of the prima facie case requires that Dr.
Weathers present evidence from which a jury could find that she
applied for promotion and tenure. Alvarado, 928 F.2d at 121; see
also, Rowe, 630 F. Supp. 2d at 607. The record is clear that Dr.
Weathers did not submit a promotion package until five (5) months
after the deadline for the submission of her promotion package
had passed. (Ver. 2d Am. Compl. (Doc. 29) ¶ 59; Weathers Dep.
(Doc. 75-8) 232:1-238:16.) That deadline was established in

33

accordance with the Trustee Policies, which require that the University notify a candidate for promotion and tenure of its decision about whether to reappoint the candidate no less than twelve (12) months before the end of the candidate's probationary term. (Peterson Aff. Ex. 1 (Doc. 66-2) 3, July 15, 2010.) Dr. Peterson's testimony, that Dr. Weathers' late submission did not allow sufficient time to comply with the University policy, is not disputed. (Peterson Aff. (Doc. 66) ¶ 21, July 15, 2010.)

In an attempt to prove the application element of her prima facie case, Dr. Weathers' has invoked the futile gesture doctrine set forth in Int'l Bhd. of Teamsters v. U.S., 431 U.S. 324, 365-67 (1977). Under the futile gesture doctrine, a plaintiff who has failed to apply for a job may still be entitled to relief under Title VII if she can establish that her failure to apply resulted from "[her] unwillingness to engage in the futile gesture" of submitting an application, due to the employer's well-known "policy of discrimination." Id. at 365-66; see also Pinchback v. Armistead Homes Corp., 907 F.2d 1447, 1451 (4th Cir. 1990.) ("[T]he failure to apply for a job does not preclude recovery if a claimant can demonstrate that [she] would have applied but for accurate knowledge of an employer's discrimination and that [she] would have been discriminatorily rejected had [she] actually applied."). The Supreme Court in Teamsters noted that an employee who relies on the futile gesture

34

doctrine in order to prove his case must carry the "not always easy burden of proving that he would have applied for the job had it not been for [the employer's well-known practices of discrimination]." Teamsters, 431 U.S. at 367-68.

Unlike the plaintiffs in Teamsters and Pinchback, Dr. Weathers has presented no evidence that her failure to apply resulted from her knowledge of a "consistently enforced discriminatory policy" by Defendants. Teamsters, 431 U.S. at 365. The Teamsters court gave as an example of a consistently enforced discriminatory policy an employer who "announce[s] his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door" or who communicates the same message "more subtly" to potential applicants "by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial and ethnic composition of that part of his work force." Id.

In Pinchback, the plaintiff was an African-American female and a prospective purchaser of a home in the defendant's housing development. 907 F.2d at 1449. When the plaintiff called to inquire about viewing the property, the real estate agent told her that "the community in which the home was located did not permit blacks to live there." Id. The Fourth Circuit affirmed the district court's finding that the defendant had a "racially

discriminatory policy" and that the plaintiff's failure to make an offer for the property stemmed from her "unwilling[ness] to engage in [a] futile gesture." Id. at 1450, 1452. See also U.S. v. Gregory, 871 F.2d 1239, 1241 (4th Cir. 1989) (holding that the plaintiff successfully proved a Title VII violation where the defendant Sheriff admitted on four (4) separate occasions "that he had a policy of discriminating against women when considering them for deputy positions").

Dr. Weathers has presented no evidence to suggest that UNC, or the faculty of the MCH Department, had a policy of denying tenure to African Americans. Although Dr. Weathers alleges in her complaint that Defendants engaged in an "ongoing pattern or practice of race discrimination" (Ver. 2d Am. Compl. (Doc. 29) ¶ 2), such "mere allegations" without "any significant probative evidence" to support them do not entitle Dr. Weathers to overcome summary judgment.[19] Anderson, 477 U.S. at 248-49 (internal quotation mark omitted). In contrast, Defendants have produced extensive evidence to show that Dr. Peterson, the MCH Department, the School of Public Health, and the University took substantial efforts to help Dr. Weathers raise the quantity and caliber of her research contributions to the level necessary for obtaining

---

[19] This court finds that the "racially-based comments" alleged by Dr. Weathers do not reveal evidence of discrimination, or a policy of discrimination, as more fully addressed in Part II.B.3 infra.

36

tenure.[20]  (See Peterson Aff. (Doc. 66) ¶ 7, 9, July 15, 2010;

Rimer Aff. Ex. 8 (Doc. 65-4) D00000366-67, July 15, 2010; Foster

Aff. (Doc. 69) ¶ 7, July 14, 2010.)  Similarly, the record

reflects repeated attempts by Dr. Peterson and Ms. Cotcamp to

assist Dr. Weathers with the successful completion of her

application. (Cotcamp Dep. Ex. 43 (Doc. 72-1); Peterson Aff. Ex.

13 (Doc. 66-9), July 15, 2010.)  Rather than implicating the

futile gesture doctrine, this evidence simply reflects a refusal

by Dr. Weathers to cooperate with necessary steps to meet the

requirements of the University and the rules contained in the

APT Manual.

    Dr. Weathers argues that by notifying her that her refusal

to timely provide a list of references would amount to "a

decision to stop [the Department's] collective efforts" to

further her candidacy for promotion and tenure, Dr. Peterson

engaged in "differential treatment directed to [her], a racial

minority."  (Peterson Aff. Ex. 13 (66-9) 1, July 15, 2010;

Weathers Aff. (Doc. 2) ¶ 10.)  However, Dr. Weathers has not

presented any evidence that Dr. Peterson had ever accepted the

promotion package of any candidate, minority or otherwise, who

failed to submit a list of references or who submitted their

promotion package five (5) months after the deadline.  During her

deposition, Ms. Cotcamp stated that she reminded two (2) other

---

[20] See supra note 4.

tenure candidates of the need to submit a list of references, and those candidates responded to her with their lists of references within a week of her first reminder. (Cotcamp Dep. (Doc. 72-1) 81:9-12.) Dr. Weathers, on the other hand, persisted in her intent to submit her promotion package on May 1, 2007, without the letters of reference, despite Ms. Cotcamp's notice and Dr. Peterson's warnings. (Peterson Aff. Ex. 13 (Doc. 66-9) 1-3, July 15, 2010.)

Although her submission of a promotion package on May 1, 2007, may have been futile due to her own refusal to timely provide a list of references to Dr. Peterson, the evidence does not support a finding that any futility arose from a discriminatory practice by Defendants. On this record, Dr. Weathers has failed to present a genuine issue of material fact concerning her failure to apply for tenure. Accordingly, this court finds that Dr. Weathers did not submit an application for tenure in accordance with University requirements.

### b. Qualification

Even assuming, _arguendo_, that Dr. Weathers applied for tenure or that her failure to apply for tenure resulted from her unwillingness to engage in a futile gesture, Dr. Weathers has not presented evidence that she was qualified for promotion and tenure. _Alvarado_, 928 F.2d at 121; see also, _Rowe_, 630 F. Supp. 2d at 607. Because "professorial appointments necessarily

38

involve subjective and scholarly judgments," district courts are not to "substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure." Jiminez v. Mary Washington Coll., 57 F.3d 369, 376-77 (4th Cir. 1995) (internal quotation marks and citation omitted). Unless a university's tenure decisions "can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professional." Id. (internal citation omitted).

According to the Trustee Policies, conferral of academic tenure "requires an assessment of institutional needs and resources and evidence of service to the academic community, potential for future contribution, commitment to the welfare of the University, and demonstrated professional competence, including consideration of commitment to effective teaching, research or public service." (Peterson Aff. Ex. 1 (Doc. 66-2) 2, July 15, 2010.) The APT manual sets forth the three (3) major elements by which candidates for reappointment, promotion and tenure are judged:

> (1) Research, or the creation of new knowledge pertinent to public health;
> (2) teaching, or the dissemination of knowledge to students, health professionals and the public; and
> (3) practice, or the advancement of the innovative application of knowledge (and evaluation of the impact of this application) to enhance the

39

health of the public. (Peterson Aff.
Ex. 2 (Doc. 66-3) 10, July 15,
2010.)

Upon their review of Dr. Weathers' qualifications for
promotion and tenure, the full professors concluded that Dr.
Weathers "[did] not satisfy minimum expectations for an assistant
professor after 5½ to 6 years of service in either demonstrated
professional competence or potential for future contributions."
(Kotch Aff. Ex. 16 (Doc. 67-4) 2, July 15, 2010.) The full
professors noted that Dr. Weathers' "total research productivity
. . . [was] inadequate." (Id.) Specifically, the full professors
noted that Dr. Weathers had only published six (6) papers during
her six (6) years at UNC, four (4) of which were "based on Dr.
Weathers' dissertation which she completed prior to her arriving
at UNC." (Id.) Dr. Weathers had only published three (3)
articles since her reappointment in 2004. (Rimer Aff. (Doc. 65) ¶
17, July 15, 2010.) Moreover, Dr. Weathers had only secured one
(1) externally funded grant on which she served as the principal
investigator, and "[that] level of funding was not indicative of
any future potential to support a minimum of 50% of her salary
which tenured faculty are expected to do." (Kotch Aff. Ex. 16
(Doc. 67-4) 2, July 15, 2010.) In response to the full
professors' recommendation, Dr. Peterson also declined to
recommend the reappointment, promotion, and tenure of Dr.

Weathers based, in part, on her scant publication record. (Peterson Aff. (Doc. 66) ¶ 29-30, July 15, 2010.)

The record reflects that the junior faculty members who were promoted to tenure in the School of Public Health at UNC, during the decade preceding Dr. Weathers' nonreappointment, had substantially more publications than Dr. Weathers at the time they were promoted. (Rimer Aff. (Doc. 65) ¶ 19, July 15, 2010.) Dr. Weathers does not dispute Dean Rimer's account of the publication statistics for the School of Public Health faculty as a whole, wherein the median number of publications authored by junior faculty members who were promoted and tenured from September 1, 1999, until December 1, 2007, ranged from twenty (20) in Nutrition to sixty-three (63) in Epidemiology. (Id.) The mean during the same time period ranged from twenty-seven (27) in Nutrition to fifty-nine and eight-tenths (59.8) in Epidemiology. (Id.) Even the faculty member with the fewest publications had twice as many publications as Dr. Weathers at the time he was promoted, and he was also listed as the Principal Investigator on twelve (12) grants. (Id.)

Dr. Weathers presents no evidence, other than her own conclusory allegations, to demonstrate how she possessed the qualifications necessary for obtaining tenure at UNC. Dr. Weathers' "conclusory, personal belief that she meets all of the requirements" for tenure set forth by UNC "cannot create a

genuine issue of material fact for trial. <u>Rowe</u>, 630 F. Supp. 2d at 609 (citing <u>Thompson v. Potomac Elec. Power Co.</u>, 312 F.3d 645, 649 (4th Cir. 2002)). <u>See also</u> <u>Mackey</u>, 360 F.3d at 469-70 ("A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case of discrimination."). In <u>Rowe</u>, another court in the Middle District of North Carolina granted summary judgment for the defendant university, in part, because the plaintiff had failed to establish that she was qualified for promotion and tenure. 630 F. Supp. 2d at 609. In particular, the plaintiff in <u>Rowe</u> lacked the research and publication record necessary for obtaining tenure. <u>Id.</u>

The Seventh Circuit Court of Appeals granted summary judgment in favor of the defendant university where the plaintiff failed to prove that "she was meeting [the university's] legitimate requirements regarding research and publishing," when she only published five (5) peer-reviewed publications during her six (6) years at the university. <u>Lim v. Trs. of Ind. Univ.</u>, 297 F.3d 575, 581 (7th Cir. 2002). Like Dr. Weathers, the plaintiff in <u>Lim</u> "was warned that she was not meeting the publication expectations established by the Department of Anatomy." <u>Id.</u> Nevertheless, the plaintiff failed to increase her rate of publication even after she received criticism at her annual review for not publishing at an acceptable rate. <u>Id.</u>

42

Similar to the plaintiff in <u>Lim</u>, Dr. Weathers had six (6) articles that had either been published or accepted in refereed journals as of May 1, 2007. (Weathers Dep. (Doc. 71) 46:14-47:1.) The record reflects, despite being told by Dr. Beukens, Dr. Peterson, and the Mentoring Committee that she should publish several articles per year in order to be eligible for tenure, Dr. Weathers did not increase her rate of publication after she was reappointed to a second probationary term. (Buekens Dep. Ex. 44 (Doc. 70-2) 1; Peterson Aff. Ex. 7 (Doc. 66-7) 2, July 15, 2010; Rimer Aff. Ex. 8 (Doc. 65-4) D00000365, July 15, 2010.) The record reflects a failure by Dr. Weathers to publish anything during the three (3) years leading up to the decision to deny her reappointment. (Weathers Aff. Ex. A (Doc. 2-2) 2-3.)

To explain her scarce publication record, Dr. Weathers points to the unwillingness of faculty members in the MCH Department to collaborate with her. (Weathers Aff. (Doc. 2) ¶ 7(c)) ("Not one faculty member ever . . . invited Plaintiff to collaborate with him or her on publications.") However, Dr. Weathers' allegation, which is unsupported by "any significant probative evidence," is belied by the record.[21] <u>Anderson</u>, 477 U.S. at 249 (internal quotation mark omitted). As previously set forth herein, Defendants have produced evidence to show that Dr. Peterson and others on the faculty offered to introduce Dr.

---

[21] See <u>supra</u> note 4.

Weathers to individuals with whom she could possibly collaborate, and those invitations were for the most part refused by Dr. Weathers. (Peterson Aff. (Doc. 66) ¶ 9, July 15, 2010; Rimer Aff. Ex. 8 (Doc. 65-4) D00000366-67, July 15, 2010; Foster Aff. (Doc. 69) ¶ 7, July 14, 2010.)

Dr. Weathers argues in her brief that Dr. Kilpatrick said that "senior faculty will put junior faculty's names on papers and collaborate to bring the junior faculty's careers along," but that no one offered to do the same for her. (Mem. Opp. Defs.' Mot. Summ. J. (Doc. 72) 7.)  Dr. Weathers misstates what Dr. Kilpatrick said during his deposition; Dr. Kilpatrick in fact stated that senior faculty members "are eager to work with junior faculty and to put the junior faculty's [sic] person's name *first* on publications if it helps that person." (Kilpatrick Dep. (Doc. 72-3) 97:14-16 (emphasis added)).  By omitting the word "first" from her citation of Dr. Kilpatrick's testimony, Dr. Weathers insinuates that senior faculty add the names of junior faculty members to their publications regardless of whether that faculty member contributed to the work.  Dean Rimer clarified in her affidavit that "[i]t would not be reasonable or even consistent with current academic publishing practices and ethical standards to put someone on a publication who is not intimately involved with a particular project." (Rimer Aff. (Doc. 65) ¶ 14, July 15, 2010.)

Dr. Weathers' conclusory attempts to blame her scarce publication record on the other faculty members in the MCH Department do not create a genuine issue of material fact for trial. In the words of the Lim court, "[b]y even the most permissive of accounts," Dr. Weathers "did not meet the research and publishing criteria established by her Department. Accordingly, she has failed to establish a prima facie case of employment discrimination." Lim, 297 F.3d at 581.

> c. **Whether Denial of Tenure and Promotion**
> **Occurred Under Circumstances Giving Rise to**
> **an Inference of Discrimination**

Assuming for the sake of argument that Dr. Weathers applied and was qualified for promotion and tenure, she has nevertheless failed to establish that her application was denied under circumstances giving rise to an inference of unlawful discrimination. Alvarado, 928 F.2d at 121; see also, Rowe, 630 F. Supp. 2d at 607. An inference of discrimination may be warranted where a university grants the tenure application of a similarly or less qualified applicant who is not a member of the plaintiff's protected class. See Rowe,630 F. Supp. 2d at 610; see also Smith v. Univ. of N.C., 632 F.2d 316, 341 (4th Cir. 1980) (explaining that the fourth element of the McDonnell Douglas prima facie case "can be satisfied in cases of faculty promotion by requiring the plaintiff to show that the college had promoted other faculty members with qualifications similar to

those of the Title VII plaintiff to the desired faculty rank at approximately the same time").

Dr. Weathers has not presented any evidence that the School of Public Health has ever granted tenure to a non-African-American applicant whose qualifications were commensurate with or inferior to Dr. Weathers' qualifications. In her affidavit, Dr. Weathers acknowledges that her publication record evidences a "deficiency in co-authored publications."[22] (Weathers Aff. (Doc. 2) ¶ 9.)

Dr. Weathers contends that while the quantity of her co-authored publications was fewer than that of non-African-American junior faculty on the tenure track, the number of lead author[23] publications she has produced is "commensurate with those of non-African-American junior faculty members on the tenure track." (Id.)  However, Dr. Weathers has presented no evidence, other than her own "naked opinion," to support this contention.  See

---

[22] It appears to this court that most of the peer-reviewed publications at issue in this case, even many of those for which Dr. Weathers was lead author, are, in fact, "co-authored publications."  However, Dr. Weathers seems to adopt the term "co-authored publications" to refer to publications for which a tenure candidate is not the lead author (i.e. publications in which the tenure candidate's name appears second, third, or fourth, etc. on the byline). This court will use the term "co-authored publications" consistently with Dr. Weathers' use thereof.

[23] From the record, it appears that the terms "lead author" and "first author" are used interchangeably to refer to the individual whose name appears first on the byline of a publication.

generally <u>Goldberg v. B. Green and Co.</u>, 836 F.2d 845, 848 (4th Cir. 1988) (noting that the plaintiff's "own naked opinion, without more, is not enough to establish a prima facie case of age discrimination").

In fact, the record demonstrates that all three (3) of the junior faculty members who were promoted to Associate Professor in the MCH Department during the eleven (11) years preceding Dr. Weathers' denial of tenure had more first-authored publications than Dr. Weathers.[24] (Peterson Aff. (Doc. 66) ¶ 31-34, July 15, 2010.) When she was granted tenure in 2004, Dr. Carolyn Halpern (hereinafter "Dr. Halpern") had eighteen (18) peer-reviewed journal articles and was the lead author on thirteen (13) of them. (<u>Id.</u> ¶ 32; <u>see also</u> Peterson Aff. Ex. 21 (Doc. 66-16), July 15, 2010.) Dr. Anna Maria Siega-Riz (hereinafter "Dr. Siega-Riz") had thirty-seven (37) peer-reviewed articles when she was promoted and tenured in 2003, and Dr. Siega-Riz was the lead author on thirteen (13) of those articles. (Peterson Aff. (Doc. 66) ¶ 33, July 15, 2010; <u>see also</u> Peterson Aff. Ex. 20 (Doc. 66-

---

[24] This court recognizes that the publication statistics given by Dr. Peterson for all three candidates (Dr. Halpern, Dr. Siega-Riz, and Dr. Bennett) include some publications that were written before these candidates began their employment with UNC; however, Dr. Weathers has not proffered any evidence to suggest that it was improper for Defendants to consider the candidates' pre-UNC publication records for the purposes of granting reappointment, promotion, and tenure. Moreover, Dr. Weathers has not presented any evidence that she published any articles prior to her arrival at UNC that Defendants failed to considered as a part of their decision not to reappoint her.

15), July 15, 2010.)  Finally, Dr. Trude Bennett had twenty-one
(21) peer-reviewed articles at the time of her promotion and
tenure in 1999, and she was the first author on eleven (11) of
those articles. (Id. at ¶ 34; see also Peterson Aff. Ex. 19A
(Doc. 66-13), July 15, 2010; Peterson Aff. Ex. 19B (Doc. 66-14),
July 15, 2010.)

The number of articles published by each of these three (3)
MCH professors at the time of their tenure is on par with the
mean and median number of articles published by professors who
received tenure in the School of Public Health as a whole. (Rimer
Aff. (Doc. 65) ¶ 19, July 15, 2010.)  None of the individuals who
received tenure in the decade preceding Dr. Weathers' denial of
tenure were similarly situated to Dr. Weathers.  Therefore, Dr.
Weathers has failed to establish that she was denied promotion
and tenure under circumstances leading to an inference of
unlawful discrimination.[25]

Because Dr. Weathers "has not presented evidence, other than
her own unsubstantiated assertions," that she applied for tenure,
"that she was . . . qualified for promotion and tenure or that
she was rejected under circumstances giving rise to an inference
of unlawful discrimination," Dr. Weathers has failed to present a

---

[25] To the extent that any of the "racially-based comments"
alleged by Dr. Weathers could be construed to support an
inference of unlawful discrimination, those comments are
addressed in Part II.B.3 infra.

48

prima facie case of discrimination.  Rowe, 630 F. Supp. 2d at
610.

### 2. Defendants' Legitimate and Non-Discriminatory Reasons for Denying Tenure

Dr. Weathers' Title VII claim also fails because Defendants
have articulated a "legitimate, nondiscriminatory reason" for
their refusal to grant Dr. Weathers tenure.  Burdine, 450 U.S. at
253 (internal quotation marks and omitted).  Unlike Dr. Weathers'
burden in proving her prima facie case, Defendants' burden in the
McDonnell Douglas burden-shifting test is merely a burden of
production, rather than persuasion.  St. Mary's Honor Ctr., 509
U.S. at 507.

After reviewing Dr. Weathers' qualifications, the full
professors and Dr. Peterson concluded that Dr. Weathers did not
meet the requirements for promotion and tenure, in large part
because of her inadequate research productivity and her failure
to comply with the MCH Department deadline for the submission of
a promotion package. (Kotch Aff. Ex. 16 (Doc. 67-4) 2, July 15,
2010; Peterson Aff. (Doc. 66) ¶ 28-30, July 15, 2010.)

"It has been said that 'publish or perish' is the watchword
of academia, and courts have held that a lack of publication
during a professor's term of employment at a school to be a
legitimate, non-discriminatory reason for denial of tenure."
Rowe, 630 F. Supp. 2d at 611 (citing Rosado v. Va. Commonwealth

49

<u>Univ.</u>, 927 F. Supp. 917, 937 (E.D.Va. 1996) (finding that the defendant employer articulated a legitimate, non-discriminatory reason where "[t]he comments of the members of the promotion and tenure committees reflect a reasoned decision not to promote or grant tenure based on lack of a constant and satisfactory record of research and publication")). By producing evidence of Dr. Weathers' limited number of publications, in addition to evidence of Dr. Weathers' limited work as a professor and an advisor, Defendants have produced specific evidence of a legitimate, non-discriminatory reason for denying Dr. Weathers reappointment, promotion, and tenure.

### 3. Pretext

Under the <u>McDonnell Douglas</u> burden-shifting test, when Defendants articulate a legitimate, non-discriminatory reason for their decision to deny Dr. Weathers' promotion and tenure, Dr. Weathers then must prove by a preponderance of the evidence that the reason proffered by Defendants was pretextual. <u>Burdine</u>, 450 U.S. at 253. To satisfy the pretext prong of <u>McDonnell Douglas</u>, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason" for the denial of tenure. <u>Jiminez</u>, 57 F.3d at 378 (internal quotation marks and citations omitted). The Eighth Circuit has noted that "the plaintiff's evidence of pretext must be of such strength and quality as to permit a reasonable finding that the denial of tenure was

50

obviously unsupported." Qamhiyah v. Iowa State Univ. of Sci. and Tech., 566 F.3d 733, 747 (8th Cir. 2009) (internal quotation mark omitted). Indeed, "[t]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee. A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus." Id. (quoting Roeben v. BG Excelsior Ltd. P'ship, 545 F.3d 639, 643 (8th Cir. 2008)).

Dr. Weathers has provided no evidence to contradict UNC's conclusion that her research productivity was substantially inferior to other junior faculty who were granted promotion and tenure during the years preceding the denial of her candidacy. See Rowe, 630 F. Supp. 2d at 611. Moreover, Dr. Weathers has failed to present evidence that her race was a factor in the denial of her promotion and tenure. Although Dr. Weathers has alleged that she "endured . . . numerous racially-based comments" during her time at UNC (Weathers Aff. (Doc. 2) ¶ 6), these comments are insufficient to permit a reasonable inference of discriminatory animus or to support a finding that the denial of her tenure was "obviously unsupported." Qamhiyah, 566 F.3d at 747. See Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated, and '[u]nless the

remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of [discrimination].'" (quoting <u>McCarthy v. Kemper Life Ins. Cos.</u>, 924 F.2d 683, 686 (7th Cir. 1991)), <u>overruled on other grounds by Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003).

None of the racially-based comments allegedly made by Defendants and other UNC faculty members related to the employment decision at issue in this case, i.e. the decision to deny Dr. Weathers reappointment, promotion and tenure. With the exception of Dr. Foster's email series, which occurred in March 2007, all of the comments were made at least a year before the decision to deny Dr. Weathers tenure. (Weathers Aff. (Doc. 2) ¶ 6.) In fact, most of the comments were made in 2005 or earlier. (<u>Id.</u> ¶ 6(a)-(h), (k).) Many of the comments, including all of the comments allegedly made by Dr. Kotch, were made before Dr. Weathers was successfully reappointed to a second probationary term in September 2004. (<u>Id.</u> at ¶ 6(a)-(d)). <u>See</u> <u>Birkbeck v. Marvel Lighting Corp.</u>, 30 F.3d 507, 511-12 (4th Cir. 1994) (finding that a discriminatory statement which was made over two years before the challenged employment action was too remote to be used as evidence of discrimination); <u>Phelps v. Yale Sec., Inc.</u>, 986 F.2d 1020, 1026 (6th Cir. 1993) (finding that because discriminatory statements were made approximately a year before

the challenged employment action, they were too remote "to have influenced the termination decision").

Moreover, many of the comments that Dr. Weathers considers to be "racially-based," in fact have nothing to do with her race; instead, they reflect a personal conflict between Dr. Weathers and the speaker. In Hawkins v. PepsiCo, Inc., 203 F.3d 274, 276 (4th Cir. 2000), the Fourth Circuit affirmed the district court's dismissal of the plaintiff's claim due to her failure to show "[anything] more than a routine difference of opinion and personality conflict with her supervisor." The Hawkins court refused to "transmute such ordinary workplace disagreements between individuals of different races into actionable race discrimination." Id. For example, the comments made by Dr. Kotch and Dr. Foster via email to Dr. Weathers in May 2004 and March 2007, like many of the other communications, are the type of "routine difference of opinion and personality conflict" that the Hawkins court found was insufficient to prove actionable race discrimination. Id.; (Weathers Aff. (Doc. 2) ¶ 6(d), (l).) Never once in those emails, whether explicitly or implicitly, did Dr. Kotch or Dr. Foster mention anything remotely touching on Dr. Weathers' race. (Weathers Aff. (Doc. 2) ¶ 6(d), (l).) Instead, their criticism stemmed from their disapproval of the way that Dr. Weathers handled problems within the MCH Department. (Id.) Therefore, the discriminatory comments alleged by Dr. Weathers

fall short of the "strength and quality" of evidence required to show that Defendants' legitimate and non-discriminatory reasons for denying tenure were "mere pretext." Qamhiyah, 566 F.3d at 746-47. For the foregoing reasons, Dr. Weathers has failed to prove that Defendants' reasons are mere pretext. Therefore, because there are no genuine issues of material fact, summary judgment is granted for Defendant UNC on Count Two of Dr. Weather's complaint.

> ### C. Section 1981 and 1983 Claims Against Defendants Peterson, Kotch, Rimer, Foster, and Martin in their Individual and Official Capacities

In addition to her Title VII claim against Defendant UNC, Count One of Dr. Weathers' complaint alleges that Defendants Peterson, Kotch, Rimer, Foster, and Martin are liable for employment discrimination, in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 1983. The United States Supreme Court has acknowledged that the McDonnell Douglas framework "is fully applicable to racial-discrimination-in-employment claims" under both 42 U.S.C § 1983 and 42 U.S.C. § 1981. St. Mary's Honor Ctr., 509 U.S. at 506 n.1; see also Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (applying McDonnell Douglas framework to § 1981 claims). Therefore, for the reasons set forth in Part II.B above, the individual Defendants are also entitled to summary judgment on Count One of Dr. Weathers' Complaint.

## III. CONCLUSION

For the reasons set forth herein, Defendant's motion for summary judgment (Doc. 63) is **GRANTED**. A judgment in accordance with this opinion will be filed contemporaneously herewith.

This the _____18th_____ day of November 2010.


William L. Osteen, Jr.
United States District Judge